**KECO INDUSTRIES, INC.**

v.

**The UNITED STATES.**

**No. 173–69.**

United States Court of Claims.

Feb. 20, 1974.

Robert G. Adair, Dayton, Ohio, attorney of record, for plaintiff.

David R. Schlee, Washington, D. C., with whom was Acting Asst. Atty. Gen. Irving Jaffe, for defendant. Judith Ann Yannello, Washington, D. C., of counsel.

Before DAVIS, KASHIWA, and KUNZIG, Judges.

## OPINION

DAVIS, Judge:

This suit by a disappointed bidder for the recovery of bid preparation costs comes to the court for the second time. Our earlier decision, Keco Industries, Inc. v. United States, 428 F.2d 1233, 192 Ct.Cl. 773 (1970), held that the claimant had standing to sue and denied defendant's motion for summary judgment, remanding the case to the trial division for fact-finding. A trial has been had, and plaintiff now takes exception to the findings and opinion of Trial Judge Mastin G. White and to his conclusion that plaintiff's petition should be dismissed.[1]

The disputed procurement was for ground air conditioners, which are gasoline-powered cooling devices used to service military aircraft before flight. The Department of the Air Force, through the San Antonio Air Material Area ("SAAMA"), originally issued an invitation for bids in early 1966, but cancelled the invitation when a briefing conference revealed confusion in the bidders' minds about technical requirements. Later, a request for technical proposals was sent to a number of firms, as the first part of a two-step advertised procurement. Of the companies solicited, three replied, but only two submissions were found to be technically acceptable—the proposal of plaintiff Keco Industries, and that of Acme Industries. Acme's proposal requested two departures from the specifications; both concerned the government-furnished equipment. One deviation was the use of V-belt (indirect) drive rather than direct drive to power the government-furnished compressor; the other was the use of a generator rather than a battery to power the cooling fan motor (the generator and battery were both components of the government-furnished engine). The Government acquiesced and timely amended the final specification to permit both design changes as authorized alternatives. Acme received the contract award after its bid, based on these alternatives, was found to be substantially lower than Keco's.

During performance, Acme encountered difficulty in implementing the two specification deviations which it had requested. Adaptation of this particular compressor to V-belt drive required a costly bearing assembly, and the 25 ampere generator accompanying the gov-

---

[1]. Plaintiff also appeals from the trial judge's exclusion of certain evidence; this issue is treated in Part IV, *infra*.

ernment-furnished engine could not provide sufficient power to drive the cooling fan motor (a 100 ampere alternator was needed). Both problems were solved by the Government's issuance of formal change orders, sanctioning the required modifications and increasing the contract price.

Learning of these changes, plaintiff Keco filed a protest with the General Accounting Office, arguing that Acme should bear the cost of the modifications necessary to accommodate the specification changes which Acme itself had sought in its technical proposal. In his first decision (B–162538, August 15, 1968), the Comptroller General held for Acme on one of the items but agreed that Acme was financially responsible for the other alteration. However in January 1969 he reversed himself after Acme requested reconsideration. Briefly, the later opinion found that information in the hands of Air Force personnel " * * * was sufficient to require such personnel to question the feasibility of the Acme design shown in its technical proposal, and since the answer to the problem was readily available to the Air Force but not to Acme, such information may be considered as tantamount to actual knowledge." On this theory, the Comptroller General withdrew his partial opposition to Air Force payment to Acme of the full costs of the change orders.

Plaintiff then brought suit in this court, asserting that the Government had acted arbitrarily and capriciously and breached its implied promise fairly and honestly to consider the Keco bid. The damages sought were bid preparation expenses and anticipatory profits.

Defendant moved for summary judgment, urging that Keco lacked standing to bring suit, and that the pleadings did not present enough of a suggestion of arbitrary and capricious action to warrant a trial. As noted above, this motion was denied (except as to the claim for anticipatory profits), and trial was directed and held. The trial judge found that, at the time when the Government accepted Acme's proposal, the former did not know that the proposal was unworkable and would have to be changed. The judge also determined that the defendant's action in awarding the contract to Acme did not amount to arbitrary or capricious action in regard to this plaintiff. We affirm and adopt these conclusions.

### I.

■ It is clear, in the first place, that plaintiff did not prove that the pertinent Air Force officials had actual knowledge that Acme's technical proposal would be unworkable without major changes.[2] Plaintiff has shown us no reason why this trial finding as to actual knowledge should be disturbed. Indeed, had plaintiff launched a solid challenge to this finding, the court would be well within discretionary limits in refusing even to consider the argument, because plaintiff filed very sketchy and incomplete proposed findings before the trial judge, without citation to the record. *See* Rule 134(d)(1) and (g); WRB Corp. v. United States, 183 Ct.Cl. 409, 417 (1968). In any case, the very most that can be said, on this record, is that the interested Air Force officials had access to data which, if they had considered it (which they did not),

2. The record shows that, at the time when Acme's technical proposal was evaluated by the SAAMA panel of engineers, the Government may have had in its possession an assembly drawing of the government-furnished Trane compressor which indicated that the compressor's discharge valve might be in a position that would interfere with mounting a flywheel for a V-belt, as proposed by Acme. The evidence also shows that the Government had literature concerning the government-furnished engine which reflected that it was equipped with a 25-amp generator. But it also appears that the SAAMA panel members who evaluated and approved Acme's technical proposal were not familiar with these particular materials, and that they did not conduct a full investigation relative to the availability of pertinent data on the government-furnished property and its suitability for use in the manner proposed by Acme.

might well have raised questions about the technical feasibility of Acme's proposal.

## II.

Having reached this conclusion, the trial judge did not go further and decide whether the failure of the officials to search out and consult all the information available to them constituted a lack of due diligence. Rather, he assumed that such conduct on the part of the Government's procurement people would not provide a basis for recovery of bid preparation expenses by Keco, since he found that in this instance the Air Force's decision to permit Acme's requested deviations was reasoned, even if incorrect or negligent.[3]

To test the correctness of this holding that simple negligence is not enough to ground recovery here, it will be helpful to start by surveying, generally, the several types of claims disappointed bidders may present, and the varying considerations pertinent to these different classes of demands for compensation. The proper treatment of the specific situation now before us follows, we think, from certain of the overall principles which should govern the various kinds of actions for monetary relief by rejected bidders.

In the process of procurement by formal advertising, the awardee must ordinarily fulfill three main requirements: (1) his bid must be the one "most advantageous to the Government, price and other factors considered," (2) he must be adjudged "responsible," (*i. e.*, able and willing to perform the contract), and (3) his bid must be "responsive," (*i.

*e.*, conform in all material respects to the invitation). ASPR §§ 2.103, 2.407–1; FPR §§ 1–2.103, 1–2.407–1.[4] In certain procurements, the awardee must clear another hurdle or two as well; he must show that he is a "small business" concern, or that performance will take place in a "labor surplus area," etc. Conceivably, the Government may err in making any of the above determinations with respect to any bidder. And if it does, a frustrated bidder may feel that such irregularities (in the treatment of his bid or that of a competitor) deprived him of a fair shot at the contract.

But if one thing is plain in this area it is that not every irregularity, no matter how small or immaterial, gives rise to the right to be compensated for the expense of undertaking the bidding process. So it has been, and continues to be, necessary to develop rules and standards for judicial review of the various administrative steps in the process, and the scope of the duties owed at each stage by the Government to the allegedly aggrieved participant.

■■ The ultimate standard is, as we said in *Keco Industries I*, *supra*, whether the Government's conduct was arbitrary and capricious toward the bidder-claimant. We have likewise marked out four subsidiary, but nevertheless general, criteria controlling all or some of these claims. One is that subjective bad faith on the part of the procuring officials, depriving a bidder of the fair and honest consideration of his proposal, normally warrants recovery of bid preparation costs. Heyer Products Co. v. United States, 140 F.Supp. 409, 135 Ct. Cl. 63 (1956). A second is that proof

---

3. With respect to the deviations proposed by Acme, (1) the panel reviewing the proposal assumed, on the basis of their past experience with air-conditioner compressors and other rotating machinery, that the compressor to be furnished by the Government could be driven indirectly through the use of a V-belt, without causing any problems (most reciprocating compressors built in the last 30 years, of the type involved in the present case, have been capable of being belt-driven) ; and (2) the panel also assumed that

Acme had determined that sufficient power would be available from the generator on the government-furnished engine to power the motor for the cooling-air fan (Acme's proposal asserted that sufficient power would be available for such a purpose).

4. The Armed Service Procurement Regulations are codified at Title 32, Code of Federal Regulations, and the Federal Procurement Regulations are in Title 41, Citations are to the 1972 and 1973 editions, respectively.

that there was "no reasonable basis" for the administrative decision will also suffice, at least in many situations. Continental Business Enterprises v. United States, 452 F.2d 1016, 1021, 196 Ct.Cl. 627, 637–638 (1971). The third is that the degree of proof of error necessary for recovery is ordinarily related to the amount of discretion entrusted to the procurement officials by applicable statutes and regulations. Continental Business Enterprises v. United States, *supra*, 452 F.2d at 1021, 196 Ct.Cl. at 637 (1971); Keco Industries, Inc. v. United States, *supra*, 428 F.2d at 1240, 192 Ct. Cl. at 784. The fourth is that proven violation of pertinent statutes or regulations can, but need not necessarily, be a ground for recovery. *Cf. Keco Industries I, supra*, 428 F.2d at 1240, 192 Ct. Cl. at 784. The application of these four general principles may well depend on (1) the type of error or dereliction committed by the Government, and (2) whether the error or dereliction occurred with respect to the claimant's own bid or that of a competitor.

A. Because of the complexity of the formal advertising process, it is best to separate out the various steps and to treat first with errors charged with respect to the plaintiff's own bid. A disappointed bidder may, for instance, allege that his own bid was improperly read or evaluated as to the "price and other factors" criterion. As we have said, it is enough for recovery if an adequate showing is made that the Government acted in bad faith, *e. g.*, by predetermining the awardee or by harboring a prejudice against the plaintiff. Heyer Products Co. v. United States, supra, 140 F.Supp. at 413–414, 135 Ct.Cl. at 69–71 (1956). And suits for injunction in other courts,[5] dealing with this matter, have held that relief should be

granted when the Government awards a contract without any reasonable basis for its actions. M. Steinthal & Co. v. Seamans, 147 U.S.App.D.C. 221, 455 F. 2d 1289, 1301 (1971); Rudolph F. Matzer & Assoc., Inc. v. Warner, 348 F.Supp. 991, 994–995 (M.D.Fla.1972). This is the standard we accepted in *Continental Business Enterprises, supra.* Although based on external facts and circumstances rather than a showing of animosity toward plaintiff or favoritism for a competitor, this principle is not far removed from the bad faith test; courts often equate wholly unreasonable action with conduct motivated by subjective bad faith. *Cf.* Rudolph F. Matzer & Assoc., Inc. v. Warner, 348 F.Supp. at 995. It would be premature to comment on whether negligence in lesser degree, in the "price and other factors" evaluation of a bidder's own bid, can sometimes, in certain situations, suffice for recovery. But it is worth noting that procurement officials ordinarily have a high degree of discretion in determining whether a bid is "most advantageous to the Government."

A bidder may also contend that his bid was improperly rejected as nonresponsive. The regulations provide that an awardee's bid must "comply in all material respects with the invitation" (ASPR § 2.301(a); FPR § 1–2.301(a)), and list specific instances of nonconformity which require rejection of the bid (ASPR § 2.404–2; FPR § 1–2.404–2). If a defect fits within the narrow category of mandatory rejection (*e. g.*, failure to state a price, if required), then the disqualified bidder would have little room for argument. If, on the other hand, the existence *vel non* of a defect involves the exercise of judgment, or if it is an irregularity minor enough to be waivable under ASPR § 2.405 or

5. Suits for injunctive relief in the District Courts can provide guidance in this area, but it must be kept in mind that the standards for awarding an injunction are different in some respects. Delay in the procurement process is not an element in a bid preparation cost suit (Continental Business Enter- prises v. United States, *supra*, 452 F.2d at 1022, 196 Ct.Cl. at 638), and the existence of a damage remedy is sometimes reason for denial of injunctive relief. (M. Steinthal & Co. v. Seamans, 147 U.S.App.D.C. 221, 455 F.2d 1289, 1302 (1971)).

FPR § 1–2.405, then the cognizable complaint is that this discretion was clearly abused in the particular circumstances. Presumably, a showing that there was clearly no reasonable basis for the official action would be enough. It is much less clear whether there could be specific situations in which some lesser showing would suffice.

A party submitting a responsive and low bid may still be adjudged not "responsible," and thus denied the award. ASPR § 2.404–2(g); FPR § 1–2.404–2(e). Ordinarily, the contracting officer will have very wide discretion in making this determination (standards are set forth at ASPR § 1.900 et seq. and FPR § 1–1.1203),[6] and thus a complaining bidder would normally have to demonstrate bad faith or lack of any reasonable basis in order to prevail.

If a prospective government contractor clears all these requirements in an advertised procurement, he may still be found ineligible for award in some cases, e. g., where the contract has been "set aside" for a small business or for a labor surplus area concern. In each such case, there are procedures for determining eligibility, and the degree of leeway granted government officials by those procedures would ordinarily frame the appropriate standard for judicial review.

B. Because the selection of an awardee from a raft of competitive bidders is a comparative process, a prospective contractor may complain, as here, that government actions favoring another bidder —without any misreading or misevaluation of the claimant's own bid—prejudice the complainant's chances for the award. Of course, where such favoritism or discrimination stems from subjective bad faith (e. g., predetermination of the award), the rejected bidder can recover under the rule of Heyer Products Co., *supra*. We held in *Keco Industries, Inc. I* that such bad faith exists *prima facie* when the Government accepts a bid *knowing* that costly changes will be required because of the basis on which the competitor bid.

■ But in those cases where dishonesty and bad faith are absent, the rules governing the claimant's rights when the Government errs with respect to his *own* bid need not automatically be carried over, in every instance, to the comparable situation where the objective error solely concerns a competitor's proposal. As our prior decisions have implicitly recognized, the Government's duty to treat a bid honestly and fairly runs first of all to the enterprise submitting that bid. *Cf.* Heyer Products Co. v. United States, 140 F.Supp. 409, 135 Ct.Cl. 63 (1956); Continental Business Enterprises v. United States, 452 F.2d 1016, 196 Ct.Cl. 627 (1971). The procuring agency's enforceable responsibility to a bidder to read or evaluate properly his competitor's bid may be appreciably less in certain situations. (One relevant factor in this connection is that, although the harm asserted is that the plaintiff would likely have received the award but for incorrect preference given his successful competitor's bid, there is no assurance that any bidder would have obtained the award since the Government retains, in its discretion, the right to reject all ·bids without any liability. Robert F. Simmons & Assocs. v. United States, 360 F.2d 962, 175 Ct. Cl. 510 (1966); ASPR § 2.404 et seq., FPR § 1–2.404 et seq.).

For instance, there would seem to be a strong presumption against entitlement to bid preparation expenses where the allegation is that the Government incorrectly adjudged a competitor to be "responsible" prior to contract award. As we have noted, procurement officials have a great deal of discretion in making this determination (aside from a prior suspension or debarment), and some of the criteria are not readily susceptible to reasoned judicial review. *See* ASPR §§ 1.900 et seq.; FPR § 1–1.1203. In addition, correct appraisal of the re-

---

6. A prior determination of debarment or suspension acts as a prejudgment of nonresponsibility. Nash & Cibinic, Federal Procurement Law 258 n. 5 (2d ed., 1969).

sponsibility of a prospective contractor is clearly in the self-interest of the procuring agency; there is a built-in stimulus against error. If the determination is erroneous, and the contractor ultimately defaults on his obligation, the Government will likely suffer substantial delay and inconvenience, even though the defaulting party will be liable to answer in damages, including perhaps reprocurement costs. *See, e. g.,* ASPR §§ 8.707, 8.709; FPR §§ 1–8.707, 1–8.709. Absent fraud or bad faith, it is not easy, therefore, to conjure up situations in which a disappointed bidder could recover bid preparation expenses under the claim that the defendant wrongly appraised the awardee as "responsible".

Again, it may be that even a proven violation of some procurement regulation, in selecting the competitor,[7] will not necessarily make a good claim. Not every regulation is established for the benefit of bidders as a class, and still fewer may create enforceable rights for the awardee's competitors. *Cf.* Chris Berg, Inc. v. United States, 426 F.2d 314, 317, 192 Ct.Cl. 176, 182–183 (1970). On the other hand, it could be—we do not decide—that competitors do have an enforceable right against the making of an award to a clearly nonconforming bidder, even where the agency failed to appreciate that the bid was materially nonresponsive. *Cf.* Prestex Inc. v. United States, 320 F.2d 367, 162 Ct.Cl. 620 (1963); Albano Cleaners, Inc. v. United States, 455 F.2d 556, 559, 197 Ct.Cl. 450, 455 (1972); ASPR § 2.301; FPR § 1–2.301. Or it could be that a claim will follow from the defendant's failure to pursue the established procedures in selecting an awardee in a small business or labor surplus area set-aside. *Cf.* Allen M. Campbell Co. v. United States, 467 F.2d 931, 933–934, 199 Ct.Cl. 515, 520–521 (1972); Mid-West Constr., Ltd. v. United States, 387 F.2d 957, 961–962, 181 Ct.Cl. 774, 782–783 (1967); Otis Steel Products Corp. v. United States,

316 F.2d 937, 940, 161 Ct.Cl. 694, 699–700 (1963).

We mention these varying situations, not presented in this case, only to stress the possibility of separate rules for separate classes of problems. The point is that, in those instances in which the alleged Government wrongdoing concerns only the prevailing bid and not the claimant's own rejected proposal, there should be careful examination of the claimant's particular rights and interests with respect to that specific type of misconduct. There may well be no one umbrella rule or principle for all such cases.

### III.

With this general background, the remaining issues in this case can be readily resolved. We have held in Part I, supra, that plaintiff has failed to prove that the Air Force had actual knowledge that the Acme proposal would not work without costly changes. Accordingly, the rule of *Heyer Products Co., supra,* does not apply. It may be—this factual question does not have to be decided—that the procuring officials were negligent or less diligent than they should have been in investigating and evaluating whether the Acme bid was the more advantageous to the Government. But even on this assumption we agree with the Trial Judge that the Air Force made a reasoned, if erroneous, decision (see footnote 3, *supra*); like him, we cannot say that there was no reasonable basis for the official action. There may have been some lack of care but certainly the negligence was not gross nor was the decision irrational or totally lacking in reason. That being so, Keco has no meritorious claim.

The mere failure to exercise due diligence in the appraisal of the advantageousness of a competitor's bid, when that omission amounts to simple negligence, is not a sufficient showing of arbitrary or capricious conduct to warrant

---

7. We treat here with the choice of a competitor, not the rejection of the claimant's own bid as improper.

recovery of bid preparation expenses. The Government's duty to exercise care in evaluating the "price and other factors" of a bid runs first to the proponent of that bid and to the public and its representatives, and only then to another bidder. The responsibility to the latter is too attenuated to justify assessing damages for simple negligence, especially in light of the broad discretion of procurement officials in that aspect of the bid process. Moreover, litigation which second-guesses bid determinations, through efforts to show ordinary lack of due care in appraising competing proposals, should not be encouraged where the award was rational and made in good faith. The interference from such suits, and their impact upon contracting activities, would exact too great a price in the procurement process. *Cf.* Continental Business Enterprises, Inc. v. United States, supra, 452 F.2d at 1022, 196 Ct.Cl. at 639.

## IV.

Plaintiff also objects to the Trial Judge's ruling on a matter of procedure. Early in the trial, plaintiff sought to introduce evidence of other alleged Government misconduct during the same procurement. The judge refused to admit such evidence, because the points to which it related had not been alleged with particularity in the pleadings, as required by Rule 33(b); the judge also denied permission to amend the pleadings to include these matters. The new averments of misconduct were that defendant accepted Acme's bid although it was materially nonresponsive.[8] At the oral argument it was revealed that, although full pretrial proceedings had been held,

no mention of these subjects was made by plaintiff until the trial.

Plaintiff argues that our opinion in *Keco Industries, Inc. I* gave *carte blanche* to prove any instance of arbitrary and capricious conduct in awarding this contract. It is not clear that the specific language alluded to (428 F.2d at 1240, 192 Ct.Cl. at 784)[9] was meant to cover anything other than the Air Force's permission to Acme to use V-belt drive and a generator-powered cooling fan motor—the only specific defects referred to in the petition. But even if the court contemplated that other defects might be raised in the future, the opinion in no way dispensed with the normal rules of pleading and trial practice. At best, the court indicated that other instances of government misconduct could be shown if properly and timely brought into the case.

It is undisputed that the only specific acts of government wrongdoing mentioned or referred to in the petition (as originally filed or as amended) were the two with which the trial judge dealt. Plaintiff contends, however, that it preserved other possible bid-procedure defects by alleging in its petition, generally, a violation of "Section 2, Paragraph 5" of the Armed Services Procurement Regulations. This is apparently a reference to the four-page section in ASPR describing the two-step formal advertising. The citation obviously falls far short of the specificity called for by Rule 33(b), which requires that: "In all averments (1) of fraud * * * (2) of mistake, or (3) of action alleged to be arbitrary, capricious, or so grossly erroneous as to imply bad faith, the cir-

8. The two unauthorized deviations were said to be: (1) use of aluminum instead of copper fins in the condenser coils, and (2) use of an evaporation-type pre-cooler instead of an air-to-air heat exchanger.

9. "Plaintiff also alleges that defendant did not abide by its own regulations [footnote 10 omitted], which would bring the case directly under the facts of *Scanwell*, which involved a contract award contrary to the provisions in the invitation for bids. However,

we do not feel it necessary to explore this particular contention since we find that plaintiff has already made out an allegation of arbitrary and capricious action sufficient to warrant a trial. Therefore we will leave this particular point to be decided by the trial commissioner in connection with his examination of whether defendant's action in awarding the contract to Acme was *in fact* arbitrary or capricious." [emphasis in original]

cumstances constituting fraud, mistake, or arbitrary, capricious or erroneous action shall be stated with particularity. * * * " A naked allegation of arbitrary and capricious action is not sufficient to trigger a trial. Greenway v. United States, 163 Ct.Cl. 72, 82 (1963). Plaintiff did plead with particularity the circumstances surrounding the Government's acceptance of Acme-requested departures from the specifications, but no allegation was made or suggested as to a material nonconformity in Acme's bid. The petition simply did not present those additional grounds.

The fact that the bid nonconformities were raised by plaintiff before the Comptroller General prior to trial is of no help since, as defendant rightly points out, there is no requirement that issues raised administratively be pursued before this court. On the contrary, the submission to the General Accounting Office reenforces that plaintiff was or should have been aware, long before the trial, of a possible nonconformity in the Acme bid. Plaintiff's counsel admitted at the trial in 1971 that Keco was aware, from 1969 at the latest, that the final product deviated from the invitation in the two respects now charged, but he argued that Keco did not actually know until the Comptroller General's decision of May 10, 1971—one month before trial—that Acme had included these departures from the specifications in its bid. This latter point is not a good enough excuse. Plaintiff cannot be permitted to sit silent until full proof of every aspect of its potential claim appears. Under our Rule 36, plaintiff could have raised the issue of a nonconforming bid, of which it was sufficiently alerted in 1969, and then sought further proof through discovery procedures.[10] After plaintiff became aware in 1969 that the

final Acme product departed from the invitation requirements, it had enough information to amend its petition and seek additional facts.

■ We conclude, as did the Trial Judge, that plaintiff never raised, prior to trial, any issue relating to nonconformity in Acme's bid, and that it did not have justification for omitting such allegations if it wished to raise the point. The Trial Judge's exclusion of evidence on this matter was a proper way of enforcing the court's rules of pleading and pretrial practice. See Rule 39(b); McCormack on Evidence 440 n. 34 (2d ed., 1972); cf. Rule 114(b)(4).

On a similar basis, we uphold the refusal to permit amendment of the petition at the trial. This is a matter within the discretion of the trier. See Loral Electronics Corp. v. United States, 409 F.2d 578, 580–581, 187 Ct.Cl. 499, 503 (1969); cf. Huling v. United States, 401 F.2d 998, 1003, 185 Ct.Cl. 407, 414–416 (1968); see Rule 39(b). It would be different if plaintiff had exposed these issues early in the pretrial proceedings, or if there were some proper excuse for the belated unfolding of the new contention. In the present context, we cannot say that the Trial Judge abused his discretion in refusing to allow the amendment.

For these reasons, we hold that plaintiff is not entitled to recover. The petition is dismissed.

### FINDINGS OF FACT

The court, having considered the evidence, the decision and findings of Trial Judge Mastin G. White, and the briefs and arguments of counsel, makes findings of fact as follows:

1. The plaintiff, Keco Industries, Inc., is an Ohio corporation engaged in

---

10. Rule 36 states in pertinent part: "When the plaintiff cannot state his case with the requisite particularity without an examination of documents or things or other information in the possession of the United States, * * * he may file a petition in conformity with Rule 21(c), stating his claim as far as is in his power and specify-ing the documents or things or other information he requires. * * * Within 30 days after the filing of such petition, he shall file a motion * * * to obtain from the proper department or agency of the United States such documents or things or other information as may be deemed necessary. * * * "

business as a manufacturer of specialized air conditioning equipment, primarily for United States military requirements.

2. (a) On February 3, 1966, the San Antonio Air Material Area ("SAAMA"), Department of the Air Force, solicited bids under Invitation for Bids ("IFB") No. 41–608–66–813 for quantities of the MA–3 air conditioner. The MA–3 air conditioner is a ground air conditioner powered by a gasoline engine and designed to provide cooling for military aircraft prior to take-off.

(b) A bidders briefing conference was held on February 15, 1966, to clarify any questions that prospective offerors might have. A conference! was held because procurement had not been made for the MA–3 air conditioners since 1960 (at the Mobile Air Material Area) and because the pertinent specification had been changed considerably in the interim. Eight firms were represented at the bidders conference. The discussions at the conference raised serious questions as to whether or not the interested firms understood the technical requirements in a manner which would produce satisfactory performance in the event of a con-

tract award. Based upon the questions raised, a determination was made by the contracting officer to cancel the IFB in existence and to solicit technical proposals.

3. (a) On April 12, 1966, a letter request for technical proposals ("LRFTP") was sent to 47 firms by the San Antonio Air Material Area in connection with the Air Force's requirement for MA–3 air conditioners. Interested bidders were requested to submit technical proposals for 100 MA–3 air conditioners as the first step of a two-step formal advertising procedure, as contemplated by the Armed Service Procurement Regulations (ASPR), Part 5, Section 2.

(b) The LRFTP provided that the MA–3 requirement was to be produced in accordance with specification MIL–A–26107D, dated October 5, 1970, as amended on an attachment to the LRFTP.

(c) Subparagraph 1(d) of the LRFTP provided that the Government would furnish the following components for use in the fabrication of the air conditioner:

| Compo-nents | FSN | Nomenclature | Quantity |
|---|---|---|---|
| 1 | 4130–81601096 | Compressor, Trane Model 3F5A8. | 100 each for each program year. |
| 2 | 2805–554–9234 | Engine, packette, GLu–4/u per Mil-E–26248 and MS 24560, Model pe 150–2–26. | 100 each for each program year. |

(d) Part one of attachment 2 to the LRFTP provided that evaluation of technical proposals would be based upon the following criteria:

(1) Understanding of problem;

(2) Soundness of approach;

(3) Compliance with requirements; and

(4) Ease of maintenance.

(e) The LRFTP provided that federal and military specifications and standards cited in the solicitation were available from the Naval Supply Center in Philadelphia, or could be examined at SAAMA or various Defense Contract Administration Offices throughout the United States. Commercial specifications and standards were stated to be available from their publishers and not the Government.

4. The ASPR provisions referred to in the LRFTP defined two-step formal advertising generally as follows:

2–501 *General.* Two-step formal advertising is a method of procurement designed to expand the use and obtain the benefits of formal advertising where inadequate specifications preclude the use of conventional formal advertising. It is especially useful in procurements requiring technical proposals, especially those for complex items. It is conducted in two steps:

(i) Step one consists of the request for, and submission, evaluation, and, if necessary, discussion of a technical proposal, without pricing, to determine the acceptability of the supplies or services offered. As used in this context, the word "technical" has a broad connotation and includes engineering approach, special manufacturing processes, and special testing techniques. When it is necessary in order to clarify basic technical requirements, related requirements such as management approach, manufacturing plan, or facilities to be utilized may be clarified in this step. Conformity to the technical requirements is resolved in this step, but capacity and credit, as defined in 1–705.4, are not.

(ii) Step two is a formally advertised procurement confined to those who submitted acceptable technical proposals in step one. Bids submitted in step two are evaluated and the awards made in accordance with Parts 3 and 4 of this Section.

Two-step formal advertising requires that the contracting officer work closely with technical personnel and that he utilize their specialized knowledge in determining the technical requirements of the procurement, in determining the criteria to be used in evaluating technical proposals, and in making such evaluation. An objective of this method is to permit the development of a sufficiently descriptive and not unduly restrictive statement of the Government's requirement, including an adequate technical data package, so the subsequent procurements may be made by conventional formal advertising.

5. (a) On April 20, 1966, Acme Industries, Inc. ("Acme"), a prospective bidder, requested from SAAMA certain performance data relative to the Trane compressor, as follows:

(1) RPM;

(2) Brake horsepower;

(3) Capacity curve: RPM versus brake horsepower on R–12 and R–22 refrigerant;

(4) Maximum allowable condensing;

(5) Maximum allowable suction temperatures; and

(6) Maximum allowable RPM for R–12 and R–22 refrigerant.

(b) In response to this request for data, SAAMA conducted a routine general search for data of any nature which they might have on the Trane compressor. This search did not turn up any data. Due to the unavailability of data, Acme Industries was advised by SAAMA to contact the local Trane office for assistance. The Acme Industries representative stated that Trane had already advised that the data had not been developed or otherwise did not exist. He further stated that no further requests would be made and that Acme's proposal would be based on extrapolated data. As a result of the Acme request, the Air Force requested, and shortly thereafter obtained, from Trane a catalog (DS–361) containing information relative to the applicable compressor. This catalog was apparently forwarded to Acme. There is also evidence that a copy of Trane catalog DS–361 had previously been delivered to Acme during the bidder's conference in February 1966. The Air Force also obtained capacity curves from Trane and mailed them to Acme.

6. (a) Technical proposals were submitted by the plaintiff, by Acme, and

by Therm-Air Manufacturing Co., Inc. Evaluation of these technical proposals was performed by a panel at SAAMA. The group was headed by Adam Rozos, a mechanical engineer with considerable experience in the application of various air conditioning equipment. In addition to Mr. Rozos, the panel consisted of another mechanical engineer in air conditioning and refrigeration equipment, a mechanical engineer with aircraft specialization, and an electrical engineer.

(b) The evaluation was performed under the four criteria which were listed in the letter request for technical proposals. In evaluating the proposals, the team assumed that the would-be contractors were knowledgeable as to the characteristics of the Government-furnished property ("GFP") and had ascertained whether it was compatible with their design. Detailed design criteria were neither solicited nor evaluated. A substantial amount of expertise on the part of the would-be contractors was expected.

7. (a) The Acme proposal requested two deviations from the pertinent specification. One deviation requested by Acme was that it be permissible for the compressor to be driven by a V-belt, in lieu of being directly driven from the prime mover (engine); and the other was that it be permissible for the cooling-air fan to be driven by an electric motor powered by the generator on the Government-furnished engine, in lieu of being driven by the prime mover. The SAAMA evaluation team discussed whether these two deviations should be allowed. In addition, Mr. Rozos counseled with Mr. Madrid, his branch chief, as to whether the proposed deviations were acceptable.

(b) The consensus of the SAAMA engineers was that the deviations should be permitted, because they would promote ease of maintenance, simplification of operation, and longer life of the engine.

(c) The operative assumption of the evaluation team, based on their past experience with air-conditioner compressors and other rotating machinery, was that the compressor could be driven indirectly without any problems.

(d) As to the electric motor deviation the evaluation team assumed that Acme had determined that sufficient power was available to power the motor for the cooling-air fan. In fact, Acme's proposal assured the Government that sufficient power would be available.

(e) The SAAMA evaluation team neither discussed nor contemplated the possibility that problems might arise from these deviations.

8. (a) As a result of the evaluation of the three proposals: (1) the proposal of Therm-Air was declared to be unresponsive to the invitation; (2) the Acme technical proposal and its two proposed deviations were deemed acceptable; and (3) the plaintiff's technical proposal was considered acceptable, although its alternate proposal to employ a different compressor was deemed to be unacceptable.

(b) Specification MIL-A-26107D was amended to reflect the two acceptable Acme deviations, (1) by permitting the compressor either to be driven by a V-belt or to be directly driven by the prime mover, and (2) by permitting the cooling-air fan to be driven by the prime mover, or by a V-belt, or by an electric motor. The specification had previously required both the compressor and the cooling-air fan to be driven only by the prime mover.

(c) Both Acme and Keco were advised of the results of the evaluation, including the optional specification changes which were authorized as a result of the Acme proposal.

9. (a) Upon receiving notification of the optional specifications, the plaintiff evaluated the feasibility of making the MA-3 with the use of the permissible alternatives. The plaintiff concluded that both of the changes could be effected within the limitations set forth by the specification. However, the plaintiff did not alter its proposal because it believed that these options would be more

costly to implement than the plaintiff's original proposal. Specifically, the plaintiff was of the opinion that it would be necessary to adapt the Trane compressor, which the plaintiff considered suitable only for direct drive, with expensive alterations in order to permit indirect drive. The plaintiff also knew that the generator supplied with the Government-furnished engine was not sufficient to drive the cooling-air fan, but that performance could be achieved within the specification if the contractor was willing to furnish an adequate power source.

(b) At the time of the issuance of the LRFTP, the plaintiff had been contracting with the defendant for nearly 20 years relative to the manufacture and design of ground cooling equipment similar to the MA-3 which was to be produced under the contract contemplated in the LRFTP.

10. (a) On May 31, 1966, an invitation for bids ("IFB") was issued by SAAMA, soliciting bids from those firms (Keco and Acme) which had submitted acceptable technical proposals. The requirements for the MA-3 were the same as previously indicated in the first step, except that it was to be produced pursuant to the specification, as amended, and the respective technical proposals of Acme and Keco. The IFB further provided that "Nothing contained in said Technical Proposals shall constitute a waiver of any of the provisions of the specifications and drawings cited above. In the event of conflict between the Government Specifications/drawings and your Technical Proposal, the provisions of the Government Specifications and drawings shall govern."

(b) At the bid opening on June 10, 1966, it was determined that Acme bid $7,770 per unit for a 1-year 100-unit procurement, and $7,500 per unit for the multi-year 300-unit procurement; and that Keco bid $12,800 per unit for the 1-year requirement and $12,200 per unit for the multi-year requirement.

(c) Due to the large variance between the Acme and Keco bids, the contracting officer requested that Acme verify in writing whether its bid was correct as submitted, or whether it had made a mistake in its bid. Acme confirmed that its bid was correct, as based on its technical proposal and the Government furnishing the compressor and engine, complete with accessories. Accordingly, an award of the contract (F-41608-67-C-1139) was made to Acme as the low bidder.

11. (a) Subsequent to the award of the contract, Acme began to encounter certain problems in connection with its performance under the contract. It was first ascertained, shortly after the award, that the 25-amp generator furnished with the specified GFP engine would not provide sufficient current for the cooling-air fan. A change order was issued, directing the contractor to use and furnish a 100-amp alternator to overcome this difficulty.

(b) In the latter part of September 1966, Acme encountered difficulty in driving the compressor by a V-belt from the prime mover (or engine). It was determined that an adapter assembly was necessary to relieve the side loads imposed by the belt drive. A change order was issued, directing the contractor to incorporate a suitable adapter assembly.

(c) The contracting officer's initial position was that Acme was not entitled to further compensation for any additional costs which it incurred to correct these performance problems. The basis for his opinion was that since both the compressor and engine were commercial items, the contractor should have the responsibility for any incompatibility between these components and its technical proposal. The contracting officer and his superiors in the Directorate of Procurement and Production at SAAMA took the opposite position following receipt of advice from the staff judge advocate that the Government was liable for any necessary changes because it

had available to it the full range of data on the Government-furnished components and, therefore, that acceptance of the technical proposal was a guarantee that the GFP would work as planned. Relative to the compressor, the testimony at the trial indicated that the only data which the staff judge advocate was aware that the Government had was Trane catalog DS–361.

(d) The two changes resulted in modifications to the contract which increased the contract price for one year by $135,000 for the generator change and $154,335 for the compressor adaptation.

12. (a) The plaintiff protested the administration of the contract to the Comptroller General by letters dated September 14, 1967, and September 21, 1967. The plaintiff claimed that it was error for the Government to assume liability for the changes in connection with the compressor drive and the generator for the fan motor. Instead, the plaintiff argued that Acme assumed the risk of inability to perform pursuant to its technical proposal, particularly since it had requested the two specification deviations which were now causing Acme difficulties.

(b) Concerning the Air Force position that it had greater knowledge than Acme as to the suitability of V-belt drive for the compressor, the plaintiff stated as follows:

Information that the GFP compressor would not operate properly with a simple V-belt drive was available to anyone in the industry qualified to responsibly offer itself to the Government as a contractor for this kind of equipment. It was available. Keco had it. Keco affirms that it is readily available in trade channels. What is the validity, then, of SAAMA's determining to pay out hundreds of thousands of dollars to Acme for changes simply because SAAMA had in its files the kind of information hundreds of air conditioning manufacturers, air conditioner dealers, and suppliers had

as well. There was no obligation on the part of SAAMA to search out and distribute data available easily elsewhere—or even if it wasn't. * * *

(c) Regarding the generator, the plaintiff claimed that the available literature clearly showed that the specified engine came with a 25-amp generator. Testimony at the trial confirmed that literature was readily available from the Government or from the manufacturer of the engine which reflected that the particular engine shown by the LRFTP to be GFP came with a 25-stamp generator.

(d) It was requested by the plaintiff that the changes authorized by the contracting officer be disapproved, and that the contractor be defaulted or the award held invalid.

13. (a) In an opinion rendered on August 15, 1968 (B–162538), the Comptroller General came to the following conclusion as to the generator problem:

In the light of the above, we conclude that Acme's reference in its proposal to a 100 Amp generator, in the absence of any information in the specifications as to what size generator would be furnished with the Government furnished engine, was adequate notice that the proposal was based upon a 100 Amp generator being furnished by the Government.[1] Since it further appears that the substitution of an alternator for the generator was initiated by the Government for its own purposes, we find no basis for objection to the Government's action in agreeing to pay for this change.

(b)(1) As to the compressor, the Comptroller General stated in part as follows:

In view of the foregoing it is our opinion that the legal conclusion of the staff judge advocate is based upon error of fact, and that such conclusion cannot be supported on the facts presently of record. Accordingly, in the

---

1. But see finding 12(c).

absence of a clear showing that the Air Force knew, when the proposal was submitted and evaluated, that belt drive could not be accomplished in the manner indicated on the Acme drawing, and failed to advise Acme to that effect, we must consider the allowance of any price increase representing increased costs resulting from additional materials or design changes necessary to successful application of a V-belt drive to be unauthorized.

(2) The Comptroller General suggested that appropriate corrective action be taken with respect to the change order on the compressor unless affirmative proof of the Air Force's actual knowledge of the feature of the compressor that caused the contractor's difficulty could be shown.

14. Following the determination referred to in finding 13, Acme asked the Comptroller General to reconsider his decision on the compressor problem, and submitted a memorandum in support of its request.

15. (a) On November 13, 1968, the Air Force commented on the Acme memorandum (see finding 14), in response to a request from the Comptroller General. The Air Force recommended that payment to Acme of compensation for the additional cost required to adapt the compressor to V-belt drive be approved. This was based on two findings: (1) that Acme was unsuccessful in its efforts to obtain data on the GFP compressor referred to in finding 5; and (2) that although the Air Force did not have actual knowledge that V-belt drive would be a problem, data (primarily in the form of an assembly drawing) were available to the Air Force—and not to Acme—that might have caused an engineer to question the feasibility of V-belt drive.

(b) The assembly drawing referred to by the Air Force in its comments was found at SAAMA in October of 1968.

(c) The Air Force letter to the Comptroller General stated that the Air Force had this drawing in its possession prior to the submission of Acme's technical proposal. The testimony at the trial indicated that it is an open question as to when SAAMA first had possession of the drawing.

(d) The assembly drawing for the Trane compressor indicated that the compressor's discharge valve might be in a position that would interfere with mounting a flywheel for a V-belt.

16. In view of the representations made by the Air Force (see finding 15(c) ), the Comptroller General in a decision dated November 13, 1969 (B–162538), removed his objection to payment for the modifications to the compressor drive. The Comptroller General stated in part as follows:

In view of such statements by the Air Force, we conclude that, in the peculiar circumstances of this case, the actual information in the hands of the Air Force personnel responsible for the procurement with respect to the Government furnished compressor was sufficient to require such personnel to question the feasibility of the Acme design shown in its technical proposal, and since the answer to the problem was readily available to the Air Force but not to Acme, such information may be considered as tantamount to actual knowledge. * * *

17. Most reciprocating compressors built in the last 30 years, of the type involved in the present case, have been capable of being belt-driven.

18. At the time when the Government accepted Acme's proposal, the Government did not know that Acme's proposal was unworkable and would have to be changed.

19. The defendant's action in awarding the contract to Acme did not amount to arbitrary or capricious action in regard to the plaintiff.

### CONCLUSION OF LAW

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and its petition is dismissed.