**OLYMPIA USA, INC.**

v.

**The UNITED STATES**

and

**International Business Machines Corp.,
Defendant-Intervenor.**

No. 503–84C.

United States Claims Court.

Nov. 21, 1984.

Gerald L. Lett, Washington, D.C., for plaintiff.

Thomas W.B. Porter, Washington, D.C., with whom was Acting Asst. Atty. Gen., Richard K. Willard, Washington, D.C., for defendant.

Michael L. Burack, Washington, D.C., for defendant-intervenor.

## OPINION

SETO, Judge.

In this pre-award bid protest case filed pursuant to 28 U.S.C. § 1491(a)(3), plaintiff Olympia USA, Inc. ("Olympia") seeks preliminary and permanent injunctive and declaratory relief to prohibit the General Services Administration ("GSA") from awarding a contract under Solicitation No. FGE–D3–75283–A–9–11–84 to anyone other than Olympia. The underlying issues are (1) whether Olympia's bid is responsive, and (2) whether the Life Cycle Cost analysis employed by GSA in the procurement at issue was arbitrary, capricious or irrational. For the reasons stated below, defendant's motion to dismiss is denied, and plaintiff's motion for a preliminary injunction is denied.

## FACTS

This action arises from a procurement of single-element electric or electronic typewriters by the GSA. The solicitation governing this procurement provides that the bids are to be evaluated under GSA's established program of Life Cycle Cost ("LCC") analysis. In general, LCC analysis attempts to establish the total cost of purchasing and operating a product over its projected service lifetime. To achieve these results, the analysis employs a formula which relies in part on the results of an LCC test of the product. The formula variables not generated by the LCC testing (e.g., purchase price, ribbon cost, residual value) are supplied by other established means.

After receiving a letter from the GSA inviting potential bidders to participate in the latest round of LCC typewriter testing, Olympia submitted four "Olympia Standard" typewriters to GSA in November 1983. During the ensuing months, the typewriters were tested on GSA's robotic testing equipment in accordance with GSA's established testing procedures. In

particular, the testing machines typed 30 million keystrokes on each machine to simulate their use over a ten-year period.

On July 19, 1984, GSA issued the initial solicitation inviting bids to meet the Government's domestic requirements for, *inter alia,* single-element typewriters. As subsequently amended, the solicitation called for bids to be submitted by September 11, 1984, and identified fourteen models of typewriters that had been tested by GSA within the past five years. Because the bids were to be evaluated under the LCC procedure, these "eligible products" were the only typewriters for which bids could be submitted. The solicitation also set out the LCC formula in detail, defining its terms and discussing the methods by which the different variables would be determined. Finally, the solicitation provided for an award to the bidder submitting the unit bid price that yielded the lowest evaluated life cycle cost as calculated by the LCC formula.

Olympia received the results of its LCC tests from GSA on August 20, 1984, and submitted a bid of $320 for its "Standard" model typewriter on September 10, 1984. Similarly, International Business Machines Corp. ("IBM") submitted a bid of $575 for its previously tested Selectric III B01 typewriter. After evaluation of the bids under the LCC formula, GSA determined that IBM has the lowest evaluated LCC value ($613.57), and is in line for award of the contract. Royal is in second place with an LCC of $742.22; Olympia is third with $769.05.

On September 21, 1984, Olympia filed a letter of protest regarding this procurement with the General Accounting Office ("GAO"). In essence, Olympia alleged that (1) GSA used improper unit prices for Olympia's typewriter supplies, (2) GSA improperly calculated residual value, and (3) the LCC tests produced unreliable data because the robotic testers were improperly calibrated. On October 12, 1984, GSA submitted a report regarding Olympia's protest to the GAO. In its report, GSA concluded that Olympia's bid was nonresponsive and that its protest had no merit.

Olympia filed its complaint for declaratory and injunctive relief, together with an application for a temporary restraining order ("TRO"), in this court on October 1, 1984. After receiving the Government's assurance that the contract in issue would not be awarded until a ruling on Olympia's motion for a preliminary injunction was entered, the court denied the TRO application as moot on October 3, and requested an advisory opinion from the GAO. On October 22, Olympia filed its first amended complaint and IBM was permitted to join in the action as a defendant-intervenor. On November 2, IBM filed a motion to dismiss, followed by the government's combined motion to dismiss and motion for summary judgment on November 5. Argument was heard on the parties' motions to dismiss on November 8. On the same day, GAO issued its advisory opinion, concluding that although Olympia's bid was responsive, its protest was without merit. An evidentiary hearing on plaintiff's motion for a preliminary injunction was held on November 13–16, in Washington, D.C.

## DISCUSSION

### I. *Motion To Dismiss*

■ This court's jurisdiction over plaintiff's claim depends on the existence of an implied-in-fact contract between Olympia and the United States obligating the government to consider Olympia's bid fairly and honestly. *See CACI, Inc.-Federal v. United States,* 719 F.2d 1567, 1573 (Fed. Cir.1983). This implied-in-fact contract of fair consideration, however, arises only where a bidder submits a bid responsive to the solicitation. *See Ingersoll-Rand Co. v. United States,* 2 Cl.Ct. 373, 376 (1983). Thus, when a plaintiff's bid is ambiguous or otherwise nonresponsive to the solicitation, this court cannot exercise its equitable jurisdiction under 28 U.S.C. § 1491(a)(3) for want of an implied-in-fact contract.

In their motions to dismiss, both IBM and the government cite the contracting officer's belated determination that Olym-

pia's bid is nonresponsive as a basis for their allegations that this court lacks subject matter jurisdiction over Olympia's claims. Specifically, they contend that Olympia's bid fails to identify with the requisite certainty which, if any, of the "eligible products" Olympia is offering. This alleged ambiguity assertedly renders the bid nonresponsive and vitiates this court's jurisdiction. Plaintiff rejoins that the contracting officer's determination has no rational basis because there is adequate information in the bid for the contracting officer to determine that Olympia is offering its "Standard" model typewriter.

■ The controversy centers around a passage on page 19–A of the solicitation which reads, in pertinent part, as follows:

> The bidder shall insert, in the spaces provided below (or by attachment if additional space is needed), the name of the manufacturer and the product designation (model number) ... *Any offer which does not identify the eligible product offered will be rejected as nonresponsive.* (Emphasis in original.)

Defendants contend that Olympia's bid is nonresponsive because it does not include the required information on page 19–A of the solicitation. We disagree. The underlined passage quoted above merely indicates that the bid, *as a whole*, must identify the eligible product offered. We believe Olympia's bid meets this requirement.

■ Defendants cite several decisions of the Comptroller General for the proposition that "where a solicitation provision requires a bidder to list in its bid the 'qualified product' it will furnish, a bidder's *total* failure to identify the product it is offering is a material omission rendering its bid nonresponsive." *J.M.T. Machine Co.,* B–199650, November 19, 1980, 80–2 CPD ¶ 382 at 2 (Emphasis supplied). However, it is equally well-established that a bidder's failure to list the item name or number of a "qualified product" will be excused as a

minor informality where the bid contains other information that allows the contracting officer to determine the identity of the product the bidder intends to furnish. *See Elliott Company; Hardie-Tynes Manufacturing Co.,* B–212897; B–212897.2, January 30, 1984, 84–1 CPD ¶ 130.

■ In the instant case, Olympia's parent company in the Federal Republic of Germany is identified in several places in the bid as the manufacturer of the items offered. Of the fourteen eligible products listed in the solicitation, only one—the "Olympia Standard"—was identified as an Olympia typewriter. This information is sufficient to bind Olympia to supply the "Olympia Standard" should it receive the contract award. Although defendants contend that Olympia's bid, as submitted, would allow it to supply any other typewriter manufactured by its parent company, their argument is unpersuasive. Where GSA can determine which product is being offered without undue administrative burden, the bid is not rendered nonresponsive by a failure to delineate certain requested information. *See Elliott Company,* 84–1 CPD ¶ 130 at 2, *citing D. Moody & Co. Inc.; Astronautics Corp. of America,* 55 Comp.Gen. 1 (1975). In the procurement at issue, the solicitation clearly indicates that only bids for one of the "eligible products" may form the basis for a contract award. Because Olympia manufactures only one typewriter that has completed the required LCC testing, it would be unreasonable for the contracting officer to conclude that Olympia was offering anything other than its own tested typewriter.

Therefore, we are in accord with the Comptroller General in finding that plaintiff's bid is responsive and that the contracting officer's finding of nonresponsiveness has no rational basis. *See In the Matter of Olympia USA, Inc.,* B–216509, Slip op. (November 8, 1984).[1] As a result,

---

1. Court Exhibit ("Ct.") 4. The irrationality of the contracting officer's determination becomes manifest upon further inquiry. Olympia's bid was evaluated under the LCC formula on the

basis of the LCC variables for the "Olympia Standard" typewriter. Apparently, there was no confusion at this stage of the evaluation process. It was not until after Olympia initiated this

this court has jurisdiction to hear plaintiff's claims. Accordingly, defendant's motion to dismiss and defendant-intervenor's motion to dismiss are to be DENIED.

## II. *Motion for Preliminary Injunction*

■ The government has an obligation to fairly and honestly evaluate all bids submitted to it. To successfully challenge a government procurement decision, however, a disappointed bidder must demonstrate that the government's action was arbitrary and capricious. *Keco Industries, Inc. v. United States,* 203 Ct.Cl. 566, 574, 492 F.2d 1200, 1203 (1974). In essence, the plaintiff must show that there is no reasonable basis for the adverse administrative decision, or that the procurement procedure involves a clear and prejudicial violation of applicable statutes or regulations. *Id. See also Big Bud Tractors, Inc. v. United States,* 2 Cl.Ct. 188, 193 (1983); *Southwest Marine, Inc. v. United States,* 3 Cl.Ct. 611, 613 (1983).

Plaintiff here seeks a preliminary injunction. It is well established that a party seeking such equitable relief must show (1) that it has a likelihood of succeeding on the merits of its complaint, (2) that it will be irreparably injured without the granting of the injunction, (3) that the issuance of the injunction will not substantially harm other parties interested in the proceedings, and (4) that the grant of the preliminary injunction will be in the public interest. *Marine Power & Equipment Co. v. United States,* 5 Cl.Ct. 795, 798 (1984); *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977). Olympia fails to meet these requirements.

### A. *Likelihood of Success on the Merits*

Olympia raises several arguments in support of its motion for a preliminary injunc-

tion. First, Olympia argues that GSA used improper figures in the LCC formula for the cost of replacement supplies (i.e., ribbons, correcting tape and print wheels) not only for its own machine, but for the IBM Selectric III B01 as well. Second, Olympia contends that GSA's method for determining residual value is arbitrary and seeks its deletion from the subject LCC evaluation. Finally, Olympia asserts that the LCC testing of the typewriters in the GSA laboratory produced inaccurate and unreliable data. Olympia alleges that because the GSA testing equipment was not properly calibrated or adjusted, its machines were subjected to unrealistic abuse. Olympia also claims that GSA failed to adequately control the testing procedures.[2]

The solicitation establishes that award of the contract will be made on the basis of the lowest evaluated LCC or, where the results of the LCC evaluation cannot be "statistically differentiated", on the basis of the lowest initial bid.[3] To ensure that the LCC values are statistically distinct, GSA establishes a "90% confidence interval" around the low LCC value. Therefore, the contract will be awarded to the bidder with the lowest evaluated LCC, unless another bidder's LCC value falls within the established confidence interval. When this occurs, the lowest initial bid will control.[4] As presently evaluated, IBM has the lowest LCC value by a wide margin, while Olympia has the lowest initial bid. To prevail, Olympia must establish that the alleged errors in the LCC evaluation warrant an award of the contract on the basis of the lowest initial bid.

■ Because our jurisdiction rests on an implied-in-fact contract arising from submission of a bid responsive to the solici-

---

court action and GSA requested the contracting officer to review the file that she found Olympia's bid to be nonresponsive. In light of the circumstances, such action should not be accorded much weight.

2. Olympia's amended complaint originally alleged that a typographical error in the solicitation regarding the number of keystrokes em-

ployed during testing was prejudicial. Olympia withdrew this portion of its complaint during the preliminary injunction hearing.

3. Plaintiff's Exhibit ("PX") 1 at 21.

4. *Id.*

tation, and because the solicitation defines the terms of that contract, we are limited to determining whether GSA followed the terms of the solicitation in evaluating plaintiff's bid. *See Alabama Metal Products, Inc. v. United States*, 4 Cl.Ct. 530 (1984); *Ingersoll-Rand Co. v. United States*, 2 Cl.Ct. 373 (1983). We find that, with respect to each of Olympia's arguments, GSA had a rational basis for its actions, and therefore properly evaluated Olympia's bid.

### 1. *Cost of Replacement Supplies*

The LCC formula set forth in the solicitation employs variables for ribbons, correction tape and print wheel replacement costs. Olympia contends that GSA used improper values for all of Olympia's replacement costs, as well as for the cost of ribbons for the IBM Selectric III B01. This argument is without merit.

The solicitation defines the method for determining the ribbon cost variable for the LCC formula:

Ribbon cost is the cost of an individual typewriter ribbon. The ribbon cost is the current cost of the ribbon to the government end-user if it is currently available through the GSA, or the manufacturer's book price if [it] is not currently available through GSA.[5]

Thus, where the ribbon is available through GSA, the price listed in the GSA supply schedule is used in the LCC formula. Where the ribbon is not listed on a federal supply schedule ("FSS"), GSA contacts the typewriter manufacturers by telephone for a government price quote.[6]

In calculating the LCC value for the IBM Selectric III B01, GSA used a replacement ribbon cost of 61.58 cents per ribbon, derived from the federal supply schedule. Olympia contends that the use of this price in IBM's LCC evaluations is improper because (1) the 61.58 cent ribbon was not used during the LCC test of the IBM typewriter, (2) the ribbon is not compatible with

the IBM Selectric III B01 typewriter, (3) the FSS does not list the ribbon as compatible with the IBM Selectric III B01, and (4) in many cases, these ribbons are not used by government workers who operate the IBM machines. The evidence adduced at the preliminary injunction hearing, however, refutes each of these contentions.

The ribbon used by GSA in its testing of the IBM Selectric III B01 typewriter is available under GSA contract from Burroughs Corp. for 61.58 cents each.[7] Although the FSS does not explicitly list the Burroughs ribbon as being compatible with the IBM Selectric III B01, other information on the FSS establishes that fact. Indeed, the FSS used in this solicitation lists the Burroughs ribbon as equivalent to IBM part number 1299095, the B01 replacement ribbon.[8] This is sufficient to establish a rational basis for GSA's use of the 61.58 cent ribbon. All the solicitation requires for an FSS price to be used in the LCC formula is that the product be *available* under a GSA contract. Because the Burroughs ribbon is compatible with the IBM Selectric III B01 and is presently available under a GSA contract, GSA calculated IBM's ribbon cost in accordance with the terms of the solicitation. As a result, Olympia's unsubstantiated argument regarding the alleged use by government workers of different, more expensive ribbons is irrelevant.

Therefore, IBM's LCC value for the Selectric III B01 remains at $613.57, with a confidence interval ranging from $575.83 to $651.30.[9] To prevail, Olympia must establish that the facts warrant a reduction of its LCC value ($769.05) of at least $117.75, thereby bringing it within IBM's confidence interval and mandating award of the contract on the basis of the initial bids.

GSA's assignment of replacement supply costs for the Olympia Standard typewriter, however, comports with the terms of the

---

5.  PX 1 at 34.

6.  Defendant's Exhibit ("DX") 2 at 6.

7.  PX 9 at 7.

8.  PX 9 at 5.

9.  DX 7 at 1.

solicitation. Office Products International, Inc. offers, under GSA contract, a ribbon compatible with the Olympia Standard for $1.95. GSA incorporated this price in its LCC formula for Olympia.[10] Additionally, because correcting tape cost is determined in the same manner as ribbon cost, GSA incorporated an FSS price of 15.3 cents per correcting tape in the LCC formula.[11] Finally, the solicitation requires that the vendor's "book price" be used for print wheel replacement cost.[12] Where book price is required, GSA has adopted the practice of contacting the vendor and requesting a government price for the needed item.[13] Using this method, GSA incorporated a print wheel price of $23.40 in Olympia's LCC formula.

Olympia argues that GSA should have used the lower prices offered by Olympia with its bid in calculating its LCC value. This argument, however, fails because GSA complied with the terms of the solicitation in selecting each of Olympia's replacement supply costs.[14] As a result, Olympia's LCC value remains unchanged with respect to replacement supply costs.

### 2. Residual Value

One of the variables in the LCC formula relates to residual value—the resale potential of a typewriter after ten years of use. To attain this figure, GSA surveyed used typewriter dealers to determine actual market values for one-year-old typewriters. The resulting figures were multiplied by a ten-year discount factor to determine the equivalent present value.[15]

■ Olympia argues that GSA's method of calculating residual value is unreasonable because it does not accurately reflect the market value of the typewriters after 10 years of heavy use. We disagree.

The fact that residual value may be difficult to estimate does not mean that it should be ignored by GSA. See Remington Rand Corp. et al., B–204084, May 3, 1982, 82–1 CPD ¶ 408 at 12–13. Rather, all that is required is that GSA employ an objective approach which yields reasonably accurate results. Id.

We believe that GSA's approach to calculating residual value is both objective and reasonable. The evidence adduced at the hearing indicates that the typewriter market distinguishes primarily between new and used machines, without regard to their actual age.[16] Given this fact, it appears reasonable for GSA to base its calculations on the value of a heavily-used, one-year-old typewriter. Therefore, we concur with the Comptroller General's evaluation of this issue and find that GSA's residual value calculations should remain a part of the LCC evaluations. See Olympia, B–216509, Slip op. at 10–12.[17]

### 3. Testing Procedures

Although Olympia attacks the reliability of the LCC test results on several grounds, its arguments are unavailing. During the LCC test, 4 key switches and 1 key cap on the Olympia typewriters failed. These failures, and associated costs, were incorporated in the LCC formula, thereby increasing Olympia's LCC value. Olympia contends that its LCC value should be recalculated without these failures because the GSA testing procedure was "fatally flawed".

This issue, however, has no bearing on the outcome of the case. Because we have found that the LCC values for the IBM Selectric III B01 and Olympia Standard are unaffected by Olympia's arguments concerning the cost of replacement supplies or residual value, Olympia must establish that a recalculation of its LCC value, eliminat-

---

**10.** DX 2G.

**11.** PX 1 at 34; DX 2G.

**12.** PX 1 at 33.

**13.** DX 2 at 6.

**14.** Additionally, there is no evidence to suggest that GSA's method of determining print wheel replacement cost is irrational.

**15.** DX 2 at 7–8.

**16.** DX 28.

**17.** Ct. 4 at 10–12.

ing only the adverse results of the testing procedure, brings it within IBM's "confidence interval." Olympia cannot meet this burden. Even if GSA eliminated all costs associated with Olympia's key cap or key switch failures, Olympia's LCC value would be reduced by only $26.10.[18] This would not be enough to affect the relative standing of Olympia and IBM.

Even assuming, arguendo, that the defects were sufficient to place Olympia in line for award after recalculation of its LCC, Olympia's arguments are without merit. The Comptroller General carefully considered each of Olympia's contentions regarding the testing procedures and dismissed each one on the basis of the considerable evidence before him. *Olympia*, B–216509, Slip op. at 5–8.[19] The evidence adduced at the hearing on Olympia's motion for a preliminary injunction differed little in substance from that before the Comptroller General. Accordingly, we find that Olympia has not carried its burden and agree with the Comptroller General's assessment of the evidence.[20] Indeed, Olympia's arguments regarding the abusive nature of the LCC test toward electronic vis-a-vis electro-mechanical typewriters are not borne out by the test results. Of the eight *electronic* typewriters tested in the most recent round of LCC tests, five experienced *no* key cap or key switch failures.[21] This data militates strongly against a finding that GSA's testing procedures prejudiced the test results for plaintiff's electronic typewriter, especially in light of the lack of evidence regarding any actual abuse of the Olympia typewriter. For these reasons, we find that GSA's testing procedures are not arbitrary, capricious or irrational and should not be disturbed.

Therefore, Olympia is not entitled to have its LCC value recalculated and IBM remains in line for award. As a result, Olympia has shown no likelihood that it will succeed on the merits of its delineated claims.

### B. *Irreparable Injury, Substantial Harm And the Public Interest*

To be entitled to preliminary injunctive relief, Olympia must show, in addition to a strong likelihood of success on the merits, that the balance of equities is in its favor and that such relief would be in the public interest. *See Washington Metropolitan*, 559 F.2d at 843. As with the merits of its case, Olympia fails to carry its burden with respect to these remaining barriers to injunctive relief. Indeed, in both its moving papers and its presentation at the preliminary injunction hearing, Olympia proffered little, if any, evidence on these issues. Therefore, in light of our determination that Olympia has no likelihood of succeeding on the merits of its claims, we find that the public interest would best be served by denying plaintiff's request for a preliminary injunction.

### CONCLUSION

For the foregoing reasons, we find that Olympia's bid is responsive, and that GSA's Life Cycle Cost evaluation in the procurement at issue was conducted in accordance with the terms of the solicitation and was not arbitrary, capricious or irrational.

It is hereby ORDERED that:

1. Defendant's motion to dismiss is DENIED;

2. Defendant-intervenor's motion to dismiss is DENIED;

3. Plaintiff's motion for a preliminary injunction is DENIED;

4. Plaintiff shall respond to defendant's motion for summary judgment by November 30, 1984;

5. Defendant and defendant-intervenor shall reply to plaintiff's response by December 7, 1984; and

6. No extensions of time will be granted for any filings required hereunder.

IT IS SO ORDERED.

---

18. DX 2 at 20.

19. Ct. 4 at 5–8.

20. *Id.*

21. DX 6 at 2.