**COASTAL CORPORATION, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 645–83C.**

United States Claims Court.

Sept. 28, 1984.

William W. Thompson, Jr., Washington, D.C., with whom was Hudson, Creyke, Kochler & Tacke, Washington, D.C., for plaintiffs.

Allen C. Peters, Washington, D.C., with whom were Acting Asst. Atty. Gen. Richard K. Willard, David M. Cohen and Thomas W. Petersen, Washington, D.C., for defendant. E. Grant Garrison, Dept. of Energy, Washington, D.C., of counsel.

### MEMORANDUM OF DECISION

KOZINSKI, Chief Judge.

This suit for recovery of bid preparation costs was originally tried before the Department of Energy Board of Contract Appeals, EBCA No. 115–2–80 (July 20, 1982). The Board ruled against plaintiffs on the merits. The Court of Appeals for the Federal Circuit thereafter held that plaintiffs' claim did not arise under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1982), and that the board therefore lacked jurisdiction to hear the case. *Coastal Corp. v. United States*, 713 F.2d 728 (Fed. Cir.1983).

Plaintiffs thereafter filed this action and the parties requested that the court decide the case on the basis of the evidentiary record established before the Department of Energy Board of Contract Appeals. After oral argument on June 7, 1984, the court ruled for defendant, rendering oral findings of fact and conclusions of law. The court then ordered defendant (as the prevailing party) to prepare written findings of fact and conclusions of law reflecting the court's rulings. Order of June 11, 1984, ¶ 2. Plaintiffs were given an opportunity to object to any of the findings that they believed to be clearly erroneous. *Id.* ¶ 3.

Defendant has filed findings and conclusions in accordance with the court's order of June 11, 1984, and plaintiffs have raised no objection. On September 5, 1984, defendant also filed a notice requesting that the court issue a written decision, suggesting that this "would assist private litigants and the Government in clarifying the area of law dealing with the recovery of bid preparation costs when a solicitation is cancelled." The court allows the motion, issuing this Memorandum of Decision based in part on defendant's proposed findings and conclusions.

### Preliminary Findings of Fact

1. The Strategic Petroleum Reserve (SPR) was established pursuant to Title I, Part B of the Energy Policy and Conservation Act of 1975, Pub.L. No. 94–163, 89 Stat. 871 (1975). It was intended to diminish the vulnerability of the United States to severe energy shortages by placing substantial quantities of petroleum products in storage. The Act authorized the Secretary of Energy to implement the SPR to the extent necessary or appropriate to effect the Strategic Petroleum Reserve Plan, which was to be submitted to Congress. 42 U.S.C. §§ 6234, 6239 (1982).

2. The SPR Plan at that time established a goal of one billion barrels of oil in storage by the end of 1985, but provided an implementation plan for only the first 750 million barrels. The SPR legislation provided that petroleum was to be acquired "to the greatest extent practicable," in a manner consonant with minimizing the cost of the reserve and the impact of such acquisition upon supply levels and market forces. 42 U.S.C. § 6240 (1982).

3. In July of 1977 oil storage began in five SPR storage sites. In September 1978, the Department of Energy decided to

solicit proposals for turnkey development of additional oil storage facilities.

4. On October 24, 1978, a pre-solicitation conference was held in Washington, D.C. At that conference, the Deputy Under Secretary for the Strategic Petroleum Reserve indicated that DOE was committed to the turnkey approach to fulfill the remainder of the SPR's storage requirements. The Deputy Under Secretary also indicated, however, that the turnkey approach had yet to receive the requisite approvals of the Office of Management and Budget, the President and the Congress, as well as the necessary funding. No definite statement was made as to the overall storage capacity that would be leased or as to how much capacity, if any, would be leased from each offeror. The offerors were advised that if the oil industry was unable to provide the storage facilities, or if the costs were prohibitively high, or if there were too great a delay in building the facilities, then DOE would consider other methods for developing the SPR.

5. On November 13, 1978, DOE issued RFP No. 01–79RA31301.000 calling for proposals whereby the contractor undertook responsibility for the selection of the storage option and the site, the development of necessary plans and studies, the construction of the facilities, operation and maintenance of the site, and the safe-guarding of the government oil under a "turnkey" fixed price contract.

6. Phase I of the RFP solicited unpriced technical proposals for the turnkey storage of a minimum of 20 million barrels of crude oil storage capacity per site. The RFP provided that DOE could make multiple awards up to a maximum of 600 million barrels of storage capacity and that DOE would later issue Phase II of the solicitation requesting price proposals.

7. A Source Evaluation Board (SEB) was established for this procurement. The SEB was to evaluate the technical proposals submitted in response to Phase I of the RFP, evaluate pricing proposals submitted in response to Phase II of the RFP to establish a competitive range for proposals, rank the proposals, and then submit its evaluation to the DOE Under Secretary, who would select the companies to be awarded a contract.

8. Phase I of the RFP provided:

*Discontinuance of Procurement*

The Government reserves the right to discontinue this method of procurement, convert to other methods of procurement, or terminate this procurement action in whole or in part at any stage. In such event, each offeror will be notified in writing of the action.

The Phase I RFP also contained the following clause:

*Expenses Related to Offeror Submissions*

This RFP does not commit the Government to pay costs incurred in the submission of a proposal or in making necessary studies or designs for the preparation thereof.

9. On or about January 23, 1979, the three plaintiffs timely submitted separate technical proposals under Phase I of the RFP. Plaintiff Coastal Corporation proposed a 40 million barrel underground storage site. Plaintiff New Jersey Strategic Petroleum Reserve proposed a 20 million barrel above ground steel tank storage site. Plaintiff Moss Bluff Storage Venture proposed a 65 million barrel underground storage site. During the course of the SEB proceedings in February, March and April 1979, DOE officials engaged in discussions with plaintiffs regarding their proposals.

10. On May 15, 1979, the Phase II Request for Price Proposal was issued. It contained the following clause:

The Government reserves the right to award one or more leases as a result of this solicitation, or to reject any or all offers.

On or about June 15, 1979, plaintiffs each timely submitted their pricing proposals under Phase II of the RFP.

11. The SEB found deficiencies in each of plaintiffs' proposals. Coastal Corporation's proposal was deficient because the

site facilities were incomplete; Coastal Corporation planned to rely on government-owned facilities then being used at the SPR Bryan Mount storage site and its proposal depended upon construction of docking facilities that would have to be financed by issuance of bonds by the local community. Coastal Corporation's Phase I proposal was given a point score of 390 out of a possible 1,000. Plaintiff New Jersey SPR's proposal had three deficiencies: plaintiff lacked control over all the land required for the development of the storage site; the site was too small; and, the proposal potentially failed to comply with the solicitation's requirements for unloading and loading of tankers. New Jersey SPR's proposal was assigned a point score of 572. Moss Bluff Storage Venture's proposal was deficient in two respects: Moss Bluff had inadequate title to the proposed site and there was a possibility that the state would disapprove of the proposed method of brine disposal. Moss Bluff's proposal received a score of 642. In addition, every proposal indicated an inability to accept the level of liability required by the solicitation for the government-owned oil.

12. Of the twenty-three contractors who submitted proposals in response to Phase I of the RFP, eleven also submitted priced proposals in response to Phase II. Of those eleven proposals, four had point scores higher than plaintiffs'. The eleven contractors who responded to Phase II offered a total of 582 million barrels of storage capacity.

13. By the end of 1978, the SPR had acquired 68.5 million barrels of crude oil in its storage sites owned by the government. DOE then began experiencing difficulties in acquiring crude oil due to events in Iran. After the issuance of the solicitation, the Defense Fuel Supply Center, DOE's oil acquisition agent, issued two solicitations for offers of crude oil on December 7, 1978, and January 15, 1979, but no contracts were awarded under these solicitations. On April 11, 1979, DOE directed the Defense Fuel Supply Center to suspend the further solicitation of crude oil for the SPR. DOE officials anticipated that after the OPEC meeting in May of 1979 there would be further solicitations.

14. In June of 1979, President Carter met with the leaders of Canada, West Germany, France, Italy, Japan and Great Britain at a summit conference in Tokyo, Japan. A communique was issued setting joint policy in response to the situation in the world oil markets. The Western Powers agreed to attempt to limit imports, with the United States agreeing to a goal of 8.5 million barrels a day. They also agreed not to buy oil for government stockpiles when it would place undue pressure on oil prices. Each nation was to consult with the others before making any decisions regarding purchases for stockpiles.

15. During this time, the DOE Under Secretary was working with a group of government officials outside DOE to develop an oil strategy for the SPR, to fill both the existing government facilities and the turnkey facilities. The inability to develop such a strategy, in light of events in the world oil market and the United States' commitment at the Tokyo summit conference, was the primary reason the Deputy Under Secretary recommended that the DOE Under Secretary cancel the solicitation for turnkey storage facilities.

16. On August 28, 1979, the DOE Under Secretary signed a decision memorandum cancelling the solicitation. The memorandum gave the following reasons for the cancellation: uncertainties in oil availability due to the Iranian crisis and restrictions on SPR fill due to import ceilings set by the Tokyo Communique; the nonbinding nature of the turnkey solicitation that required early, long-term commitment due to the "special purpose" nature of the proposal; limited acceptance of liability for storage containers and crude oil that significantly diminished the benefits of the turnkey approach; the absence of apparent cost advantages or technical innovations to offset the programmatic risks associated with the turnkey approach; and, the existence of more feasible alternative approaches such as further development of existing

government facilities as part of a "building block" approach.

17. By an undated letter received by plaintiffs on or about September 2, 1979, DOE notified plaintiffs that the solicitation was cancelled.

## Ultimate Findings of Fact and Conclusions of Law

■ 1. In order to recover bid preparation costs, plaintiffs must establish that they had a substantial likelihood of receiving an award. *Morgan Business Associates v. United States*, 223 Ct.Cl. 325, 332, 619 F.2d 892, 896 (1980). The court rejects plaintiffs' argument that they need only establish that their bids were within the zone of active consideration. The "zone of active consideration" standard, which is applicable in bid protest cases, *see, e.g., Caci, Inc.-Federal v. United States*, 719 F.2d 1567, 1572 (Fed.Cir.1983), is a test of standing and merely identifies those bidders who have a sufficient stake in the procurement process to bring an action for injunctive relief. By contrast, a bidder who would recover bid preparation costs must show not merely that its bid was actively considered but, much more, that it had a *substantial likelihood* of actually receiving the award.

■ 2. Plaintiffs have not shown that they had a substantial likelihood of obtaining an award under the solicitation. In the first place, each of the plaintiffs' bids was defective in material respects. *See* p. 4, ¶ 11 *supra.* These defects might have been resolved by negotiation but plaintiffs have failed to establish by a preponderance of the evidence that they in fact *would* have been resolved. Indeed, certain problems, such as the absence of a special permit for brine disposal and the need to finance certain construction by a bond issue from the local community, appear to be the kinds of defects that were not capable of resolution by negotiation because they were dependent upon the actions of other entities that were beyond plaintiffs' or defendant's control.

3. Even if plaintiffs' proposals had been fully responsive, they would not have been awarded a contract if DOE could have fully satisfied its requirements by awards to other, higher-ranked bidders. Because the minimum storage site capacity under the RFP was 20 million barrels, the four proposals ranked higher than those of plaintiffs accounted for at least 80 million barrels of storage and could have accounted for as much as 377 million barrels. The estimates for storage capacity that might have been awarded ranged from a low of 100 million barrels to a high of 600 million barrels. It is entirely possible that the amount of storage capacity actually awarded (had there been an award) would have been taken up entirely by the four proposals ranked higher than plaintiffs'. On this record, the court can only speculate as to the number of awards that might have been made and their amounts. Such conjecture is an insufficient basis for concluding that plaintiffs had a substantial likelihood of receiving an award such as to warrant recovery of bid preparation costs.

■ 4. Plaintiffs' claim for bid preparation costs fails on the separate ground that defendant's cancellation of the solicitation was proper and lawful and therefore did not constitute a breach of the implied contract to consider plaintiffs' bids fairly and honestly. *Morgan Business Associates,* 223 Ct.Cl. at 330, 619 F.2d at 895; *see Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 617 F.2d 590 (1980); *Keco Industries v. United States,* 203 Ct.Cl. 566, 492 F.2d 1200 (1974). Defendant's actions were not taken in bad faith, they were not arbitrary, capricious or an abuse of discretion, and they were not in violation of applicable laws or regulations.

### Absence of Bad Faith

■ 5. DOE officials acted in good faith throughout the procurement process. When the solicitation was first issued, defendant intended to acquire a lot of storage capacity as quickly as possible. Nevertheless, offerors were advised that completion of the project would be subject to numerous contingencies, including approval by

OMB, the President and the Congress, and the appropriation of sufficient funds. The Phase I solicitation specifically reserved defendant's right to "discontinue this method of procurement, convert to other methods of procurement, or terminate this procurement action in whole or in part at any stage." *See* p. 3, ¶ 8 *supra.* Phase II of the solicitation reserved defendant's right "to reject any or all offers." *See* p. 4, ¶ 10 *supra.* Plaintiffs knew or should have known that the procurement would be subject to the vicissitudes of the political process and that defendant could enter no firm contractual commitment until the project had been given close scrutiny from a political and fiscal perspective.

■ 6. The court rejects plaintiffs' argument that defendant acted in bad faith by comparing the bids not merely to each other but also to other alternatives such as storage in government-owned facilities. Upon reviewing contract bids, defendant is entitled to compare the cost-effectiveness or convenience of proceeding with a contract award to that of doing the work itself by use of government facilities and employees. *Cf.* 41 U.S.C. § 253(b) (1982) ("all [advertised] bids may be rejected when the agency head determines that it is in the public interest so to do"). In an abundance of caution, defendant here specifically reserved this inherent right in the two phases of the solicitation. As an integral aspect of the procurement process, bidders must bear the risk that no award may be made at all. *See Morgan Business Associates,* 223 Ct.Cl. at 331–32, 619 F.2d at 895.

*No abuse of discretion*

■ 7. Procurement officials are afforded substantially greater discretion in negotiated procurements than in formally advertised procurements. *Burroughs Corp.,* 223 Ct.Cl. at 65, 617 F.2d at 598; *accord Lincoln Services v. United States,* 230 Ct.Cl. 416, 427, 678 F.2d 157, 163–64 (1982). The greater the discretion of the procuring official, the greater the burden on the complaining bidder. *See DLM & A, Inc. v. United States,* 6 Cl.Ct. 329, 331

(1984); *Burroughs Corp.,* 223 Ct.Cl. at 65, 617 F.2d at 598. Plaintiffs have failed to carry this heavy burden. The evidence establishes that defendant cancelled this solicitation because of concerns as to oil availability and in response to changed foreign policy objectives. The Tokyo Summit Communique, which was the result of a meeting of eight Western Powers held in June of 1979, resulted in a change in our foreign and domestic oil policies having a direct impact on the SPR. In matters of foreign policy the President has extremely broad discretion, *Langenegger v. United States,* 5 Cl.Ct. 229, 233 (1984); *see United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 319–20, 57 S.Ct. 216, 220–21, 81 L.Ed. 255 (1936), and DOE officials were constrained to comply with the President's commitments to other nations. Cancelling the solicitation and reverting to expansion of government facilities was consistent with the government's changed requirements, was not arbitrary or capricious, and did not constitute an abuse of discretion.

*No violation of law or regulations*

■ 8. The Federal Procurement Regulations do not limit the circumstances under which defendant may cancel a negotiated procurement. *See* 41 C.F.R. Pt. 1–3 (1983). This is in contrast to advertised solicitations, which can only be cancelled in writing and for the best interests of the government. 41 C.F.R. § 1–2.404–1(b) (1983). The court has held that such cancellations require a compelling reason. *International Graphics v. United States,* 4 Cl.Ct. 186, 194 (1983); *P. Francini & Co. v. United States,* 2 Cl.Ct. 7, 10 (1983). There is much to suggest that the compelling reason standard is not applicable to negotiated procurements. Cancellation of a negotiated procurement does not raise concerns about harm to a bidder's competitive position that exist where sealed bids are opened after an advertised procurement. *See P. Francini & Co.,* 2 Cl.Ct. at 9–10. Moreover, as noted, procurement officials have significantly greater discretion in the

case of a negotiated procurement than in the case of an advertised solicitation. This discretion extends not only to selection among competing bids but also to whether to make an award at all. *See American General Leasing, Inc. v. United States,* 218 Ct.Cl. 367, 374, 587 F.2d 54, 58–59 (1978); *Robert F. Simmons & Associates v. United States,* 175 Ct.Cl. 510, 514, 360 F.2d 962, 964 (1966). Finally, the absence of regulations strongly suggests that there are no constraints on the cancellation of a negotiated procurement, other than the normal ones applicable to all agency action: that it be free from arbitrariness, capriciousness and abuse of discretion.

■ 9. In any event, defendant's cancellation of the procurement was appropriate even if gauged by the "compelling reason" standard. Regulations applicable to advertised solicitations provide the following as possible valid grounds for cancelling a procurement even after sealed bids have been opened:

(2) The supplies or services are no longer required.

. . . .

(4) Bids received indicate that the needs of the Government can be satisfied by a less expensive article differing from that on which the bids were invited.

41 C.F.R. § 1–2.404–1(b). Cancellation of this procurement easily meets both of these standards. As explained, the need for the oil storage facilities arose from particular governmental policies pertaining to the method and timetable for filling the SPR. Those policies underwent an abrupt change in direction as a result of the Tokyo Communique. The new policy drastically changed the timetable by which oil would be acquired and hence rendered the "supplies or services [provided by plaintiffs] no longer required." *Id.* § 1–2.404–1(b)(2). Moreover, a review of the bids could reasonably lead defendant to conclude that the acquisition of storage facilities under a turnkey approach was not appropriate and that expansion of government-owned facilities under a building block approach was preferable, thereby indicating that "the

needs of the Government can be satisfied by a less expensive article differing from that on which the bids were invited." *Id.* § 1–2.404–1(b)(4).

10. Plaintiffs are not entitled to recover bid preparation costs as a result of defendant's cancellation of the subject solicitation.

## Conclusion

Plaintiffs' motion for summary judgment is denied; defendant's motion for summary judgment is granted. The clerk is directed to dismiss the complaint with costs to the prevailing party.