## VULCAN ENGINEERING COMPANY

v.

## The UNITED STATES.

## No. 381–86C.

United States Claims Court.

Dec. 23, 1988.

Howell Roger Riggs, Jr., Huntsville, Ala., for plaintiff. John J. Callahan, Jr. and Henry I. Frohsin, of counsel.

Terrence S. Hartman, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant. Robert E. Little, Jr., Associate Counsel, Procurement, Naval Facilities Engineering Command, Dept. of the Navy.

## OPINION

MARGOLIS, Judge.

Plaintiff seeks to recover bid preparation costs under 28 U.S.C. § 1491(a)(1) alleging that its bid was denied fair and honest consideration because the contracting officer erroneously found the lowest responsive bidder to be "responsible" under special expertise criteria in the solicitation. Defendant moved for summary judgment, and plaintiff moved for partial summary judgment. After consideration of the entire record and after hearing oral argument, the defendant's motion for summary judgment is granted, and the plaintiff's motion for partial summary judgment is denied.

## FACTS

Vulcan Engineering Co. (Vulcan) brings this claim challenging the award of a con-

tract to Arnold M. Diamond, Inc. (Diamond) under invitation for bids (IFB) No. 62470–81–B–1597, issued by the Naval Facilities Engineering Command (NAVFAC) for foundry modernization at the Norfolk Naval Shipyard in Portsmouth, Virginia. The IFB was a 100% small business set-aside. Vulcan contends that it is entitled to recover its bid preparation costs because the definitive responsibility criteria in the IFB were misapplied when NAVFAC determined Diamond to be responsible. Vulcan alleges that neither Diamond nor its proposed subcontractor, Foundry Systems Inc. (Foundry) possessed the experience with the installation of foundry process systems required by the IFB.

The foundry process that was the subject of the solicitation involves the preparation of molds from a blend of sand and chemicals and the production of castings. Raw materials are heated, melted, and mixed with catalysts and alloys to obtain a molten metal, which is then poured into the molds to produce the castings. The castings are then cleaned and the molds destroyed. The sand is reclaimed through the removal of the chemicals and other impurities. Throughout this process, a sophisticated ventilation system is required in order to remove harmful silica particles from the air.

The IFB describes the specific work required under the solicitation as "providing new conveyorized molding, sand reclamation, sand handling, casting cleaning equipment; providing modifications to existing equipment and incidental related work." In a pre-solicitation memo to NAVFAC setting forth the shipyard's needs, the Commander of the Norfolk Naval Shipyard described the work as a "highly specialized modernization project" and went on to indicate that:

> The scope of the job is greatly weighted toward the procurement and installation of many independently manufactured pieces of specialized foundry equipment. All of the independent pieces must be precisely coordinated to provide a functional foundry system. The contractor must be knowledgeable of foundry methods and specifically must have experience in total system start-up and debugging. Detailed knowledge of sand control, metal control, sand reclamation, and ventilation and how all the process variables interrelate is absolutely necessary. Reliance upon only a manufacturers representative to start up only his individual piece of equipment, comprising only a portion of the total system, is specifically not satisfactory. Disputes over responsibilities would be guaranteed. Sole source responsibility must be ensured for the entire modernization project.

Accordingly, he informed NAVFAC that the shipyard "strongly insists upon the necessity for including previous experience requirements" and proposed requiring a minimum of five years of experience in "providing and installing turnkey chemically bonded foundry systems."

NAVFAC subsequently included paragraph 2.7 in the IFB specifying the following experience requirements to be met by the installer of the foundry equipment:

> 2.7 Qualifications of Equipment Installer: Submit data to Contracting Officer for approval by Design Division, Code 403, Naval Facilities Engineering Command, showing that the Contractor has successfully installed foundry process systems of the same type and design as specified and indicated for this project, or that he has a firm contractual agreement with a subcontractor having such required experience. The data shall include the names and location of at least two installations where the Contractor, or the subcontractor referred to above, has installed such systems. The Contractor shall indicate the type and design of each system and certify that each system has performed satisfactorily in the manner intended for a period of not less than 24 months. The specified experience requirements shall be met for each of the following foundry process systems:
> a) Melting
> b) Molding
> c) Sand Handling
> d) Reclamation
> e) Ventilation

f) Casting Cleaning

The solicitation, at paragraph 2.7.1 and 2.7.2 went on to specify information required of each bidder and the manner for its submission and consideration:

2.7.1 Information required:

a. Name of company (submitting experience) and address

b. Applicable experience

c. Plant name (in which particular foundry process system is located[ )] and address

d. Plant manager's name and phone number

e. Process system construction start date, completion date, and start-up date

f. Process system capacity and normal load

g. Number of hours the process system has operated at greater than 90 percent capacity

h. Process system designed by; constructed by

i. General description of plant and process system

2.7.2 Qualifications Evaluation and Application: The apparent low bidder shall submit the required qualification data to the Contracting Officer within 7 calendar days after bid opening, but prior to award, for determination of responsibility.

In response to the solicitation, NAVFAC received seven bids. The apparent low bidder, Frankco Manufacturing & Maintenance Co. was rejected by the Navy as "nonresponsive" because it failed to furnish a bid guarantee. Diamond became eligible for the award because it was the second lowest bidder. SMS Mechanical Contractors submitted the next lowest bid while plaintiff submitted the apparent fourth lowest bid. The breakdown of the offers as bid was as follows:

| Contractor | Base Bid |
| --- | --- |
| 1. Frankco Mfg. & Maint. Co. | $ 500,600 |
| 2. Arnold M. Diamond, Inc. | $1,441,046 |
| 3. SMS Mechanical Contractors | $1,558,000 |
| 4. Vulcan Engineering Co. | $1,860,000 |
| 5. W.F. Magann Corp. | $1,861,000 |
| 6. Pipe, Inc. | $1,970,000 |
| 7. Harry H. Kessler & Assoc. | $1,970,664 |

On December 13, 1983, the Navy notified Diamond that it was the apparent second low bidder and requested that it submit the required data concerning the qualifications of the equipment installer pursuant to paragraph 2.7 of the IFB. On December 20, 1983, Diamond submitted qualification information on its proposed subcontractor, Associated Mechanical Erectors Company. The Contract Division, on January 23, 1984, advised Diamond that the data submitted was "considered inadequate to qualify your firm for award," but because the matter was one of "responsibility," rather than "responsiveness" to the solicitation, Diamond was free to submit additional data or another proposed subcontractor for approval. On January 31, 1984, Diamond proposed subcontracting with Foundry for installation and submitted a statement describing Foundry's experience on projects for the Ductile Iron Company of America (DICOA) and Griffen Pipe Products Division (Griffen).[1]

1. In response to the Navy's request, Diamond's second response included the following data concerning Foundry's work at the DICOA and Griffen installations:

Experience:
1) Ductile Iron Co. of America (DICOA)
Lathrop Avenue
P.O. Box 2005
Savannah, Ga. 31402
James Rendeiro, President
912–234–4423
Air Set system with a mold capacity of 5′ × 5′ × 15″/15″
Construction started 1978

Completed 1978 December
Start up 1979 January
System Capacity and Normal Load Mold 5
Maximum is 5″ × 5″ × 3″—continuous mixer size is 1,200 lbs. per. min.
9 tons of ductile iron per hour.
Pour capacity into various mold sizes plus a green sand side floor.
Normal load is determined by influx of commercial orders.
Operation at greater than 90%. 4 years.
Process system designed by Foundry Systems Equipment Co.

The contracting officer, William Mathews, forwarded the information contained in Diamond's second submittal to Joe Watson who was Head of the Mechanical Engineering Branch, NAVFAC Engineering and Design Division, known as "Code 403" in paragraph 2.7 of the IFB. Watson, in turn, passed the information on to Harold Jenkins, a senior mechanical engineer in the design division whose responsibility was to verify the information and check the supplied references. According to deposition testimony, Jenkins conducted an investigation into the qualifications of Foundry. Jenkins indicated that he requested additional information from Foundry's references and that he found no problems. Jenkins passed this conclusion on to Watson along with a recommendation that the contract be awarded to Diamond. Watson testified that he instructed Jenkins to double check certain specific aspects of the information before a formal recommendation to award the contract would be made to the contracting officer. This work was done, and a finding that Diamond was responsible and a recommendation to award the contract was made to the contracting officer by memo dated February 13, 1984.

While the second submittal was being reviewed by the design division, plaintiff, by letter dated February 1, 1984, wrote NAVFAC officials and stated that it "would like to go on record as having contested the credentials of the Arnold Diamond Company and SMS Inc. with respect to the ... project." During early February, the Navy contacted Diamond, SMS and plaintiff and requested an extension of the period during which the bids could be accepted. All three bidders agreed and SMS, the second lowest responsive bidder, also provided information regarding "qualification of [its] equipment installer as per section number 00101.2.7 in case the low bidder [Diamond] withdraws."

By letter dated February 16, 1984, the Navy notified plaintiff that the data submitted by Diamond was still under review. Plaintiff, in a February 29, 1984 letter, again questioned the qualifications of Diamond and also Foundry, alleging that officials at DICOA and Griffen had confirmed that Foundry had acted "only as a broker of equipment and did not perform as a contractor or engineer." This information was apparently received by contracting officials of the Navy prior to the award, but NAVFAC nevertheless issued a notice of award to Diamond.

On March 5, 1984, plaintiff filed a bid protest with the General Accounting Office challenging the award to Diamond. The Comptroller General, on October 12, 1984, sustained plaintiff's claim for bid preparation costs, finding that Diamond did not meet the definitive responsibility criteria. *Vulcan Engineering Co.*, B-214595, 84-2 C.P.D. ¶ 403 (1984). Plaintiff and NAVFAC both requested reconsideration. On February 27, 1985, the Comptroller General affirmed the earlier decision find-

Constructed by Foundry Systems Equipment Co.
General description of plant—We are forwarding drawings & illustrations and a reprint from a casting magazine.
2) Griffen Pipe Prod. Div.
Amstead Industries
Upper Basin—P.O. Box 740
Lynchburg, Va. 24505
George D. Ferguson, Jr.
804-845-8021
  Air Set system with a Mold capacity/size of 30" × 48" × 15" × 15" (Various cast iron flask size)
  Construction Start Date—1980 June
  Completion—1981 January
  Start up date—1981 February
  The System capacity and normal load ...
  Mold size varies but a nominal size would be 30" × 48" × 15 "/15"

Normal loading would be approximately 30 molds per hour.
Normal loading is dictated by the influx of commercial orders.
Operating at greater than 90%—1½ years.
Process system designed by Foundry Systems Equipment Co.
Constructed by Foundry Systems Equipment Co.
General description of plant—We are forwarding drawings & illustrations.
This plant makes water, gas & soil pipe fillings [fittings]—an adjunct to a ductile iron pressure pipe manufacturing foundry.
In addition, Foundry Systems Equipment Co., Inc. has been designing foundries and furnishing equipment & systems in all metal configurations for over 31 years.

ing that the plaintiff merely reiterated previously submitted arguments decided in the initial protest, which did not provide a basis for reconsideration, and that the government's request was untimely.

Plaintiff, on June 16, 1986, filed a complaint in this court seeking bid preparation costs in the amount of $110,235.55, plus interest, attorney's fees and costs. Plaintiff alleges that NAVFAC failed to fairly and honestly consider plaintiff's bid because it erroneously determined that Diamond, through its proposed subcontractor Foundry, was responsible under paragraph 2.7 of the IFB. Defendant contends that plaintiff does not have standing to seek bid preparation costs, and that nonetheless, plaintiff cannot recover bid preparation costs because it cannot cite any actions of the Navy that demonstrate bad faith or fraud.

## DISCUSSION

### I. Standing to Recover Bid Preparation Costs

Defendant asserts that plaintiff does not have standing to seek recovery of its bid preparation costs because it did not have a substantial chance of obtaining the contract award. *Morgan Business Associates, Inc. v. United States*, 223 Ct.Cl. 325, 332, 619 F.2d 892, 896 (1980); *Caddell Construction Co. v. United States*, 9 Cl.Ct. 610, 612 (1986). Defendant alleges that Vulcan did not have a substantial chance because four events would have had to occur before plaintiff would have been considered for the award. These events were a determination that the lowest responsive bidder, Diamond, was nonresponsible, and then a review of that decision by the Small Business Administration (SBA), followed by a determination that the next lowest bidder, SMS, was nonresponsible, and then a review of that decision by the SBA. *See* Defense Acquisition Regulation (DAR) § 1–705.4(c), 32 C.F.R. § 1–705.4(c) (1983). Only then, defendant alleges, would plaintiff have become eligible for consideration for the award. Accordingly, defendant argues, plaintiff did not have a substantial chance of receiving the award.

In order for a disappointed bidder seeking bid preparation costs to be found to have had a "substantial chance" of receiving the award of the contract, the bidder must have been "within the zone of active consideration." *Morgan Business*, 223 Ct.Cl. at 332, 619 F.2d at 896. As this court stated in *Caddell*, "while it is not necessary for a contractor ... to show that it would have obtained the contract in issue, 'but for' the questioned action, there must at least be a 'substantial chance' showing made." 9 Cl.Ct. at 613. This showing is necessary because, as the Court of Claims in *Morgan Business* indicated, "it would be virtually impossible for the plaintiff to make a 'but for' showing." 223 Ct.Cl. at 331, 619 F.2d at 896.

The theory underlying an award of bid preparation costs is that the recipient was injured by the unjust denial of recovery of such costs, which recovery presumably would have occurred had it obtained the contract. When there are a number of bids submitted to the government, obviously all bidders would not have received the contract. Bid preparation costs are part of the ordinary costs of doing business with the government. Recovery of such costs by all, therefore, without a showing of substantial chance of award, would constitute a windfall rather than a reparation for an actual injury. *Caddell*, 9 Cl.Ct. at 612–13. Accordingly, in order to satisfy the requirements of standing necessary for maintenance of a suit, a disappointed bidder must show that it had a substantial chance of contract award. *See generally* Note, *Standing Without Principles*, 55 Geo. Wash.L.Rev. 1092, 1104–09 (1987) (discussing standing of disappointed bidders to challenge government contract awards).

There is a distinction drawn in many bid preparation costs cases, however, between the showing necessary to establish standing and that required for recovery. As the Claims Court stated in *Coastal Corp. v. United States*, 6 Cl.Ct. 337 (1984):

The "zone of active consideration" standard, which is applicable to bid protest cases, *see, e.g., CACI, Inc.–Federal v. United States*, 719 F.2d 1567, 1572 (Fed.

Cir.1983), is a test of standing and merely identifies those bidders who have a sufficient stake in the procurement process to bring an action for injunctive relief. By contrast, a bidder who would recover bid preparation costs must show not merely that its bid was actively considered but, much more, that it had a *substantial likelihood* of actually receiving the award.

*Id.* at 342 (emphasis in original). In *Coastal Corp.*, the court apparently saw no need to address the more liberal standing requirements and held that because there were four proposals ranked higher than the plaintiffs,' there was "an insufficient basis for concluding that plaintiffs had a substantial likelihood of receiving an award such as to warrant *recovery* of bid preparation costs." *Id.* (emphasis added).

Although the distinction between the showing necessary for standing and that for recovery is often blurred, it is clear that the rules governing questions of standing are more liberal. For example, in *Caddell*, plaintiff was ranked sixth among eleven proposals and the Claims Court denied standing because the plaintiff's offer placed it "too far down the list to conclude that it had a substantial chance of the award." 6 Cl.Ct. at 613. On the other hand, in *CACI, Inc.–Federal v. United States*, 719 F.2d 1567, 1575, (Fed.Cir.1983), the Federal Circuit Court of Appeals ruled that the plaintiff was within the "zone of active consideration" and thus had standing because it was one of six companies that qualified to submit best and final offers, and that its score among those offers placed it second only to the firm that would have been awarded the contract.

■ As the Court of Claims recognized, "each bid-preparation claim must be judged in the circumstances forming the basis of the challenge." *Morgan Business*, 223 Ct.Cl. at 329, 619 F.2d at 894. This court is satisfied that for purposes of standing, plaintiff has shown a "sufficient stake in the procurement process," *Coastal Corp.*, 6 Cl.Ct. at 342, and that it had a substantial chance of being awarded the contract. Although there was a lower bidder between

Diamond and plaintiff, circumstances weigh in favor of concluding that plaintiff had a substantial chance of receiving the award. Plaintiff, in addition to contesting the credentials of Diamond because of the qualifications of its subcontractor Foundry, also challenged the credentials of SMS, the next lowest bidder. In this regard, it is significant that SMS also listed Foundry as a proposed subcontractor for equipment installation. Thus, if the government determined that Foundry was not suitably qualified, as plaintiff contended during the solicitation, it is likely that plaintiff would have been next in line for award.

In addition, plaintiff was among those contractors considered qualified for the project by the Navy before the solicitation. Plaintiff was included on a list of eight "prospective bidders" identified by the Commander of the Norfolk Naval Shipyard in the July 27, 1983 memo emphasizing the need for experienced contractors. Finally, the detailed data submitted by plaintiff in conformance with paragraph 2.7 of the IFB and in support of its bid makes it clear the plaintiff was substantially qualified for award if Diamond and SMS had been disqualified. As previously stated, the test for standing is not whether the contract would have been awarded to plaintiff "but for" error on behalf of procurement officials. Plaintiff need only show a substantial chance of award, as it has.

## II. *Recovery of Bid Preparation Costs*

Plaintiff asserts that it is entitled to recover bid preparation costs based upon a showing that the defendant had no reasonable basis for its determination that the low bidder, Diamond, by virtue of the experience data for its proposed subcontractor, satisfied the definitive responsibility criteria set forth in the IFB. The determination that Diamond was a responsible bidder lacked a reasonable basis, plaintiff argues, because the procurement officials misapplied the responsibility criteria in evaluating the data submitted by Diamond. The decision also lacked a reasonable basis, plaintiff asserts, because the NAVFAC technical personnel, "Code 403," charged

with evaluating Diamond's proposal were not provided with a copy of plaintiff's protest letter of February 1, 1984 before the recommendation was made to award the contract on February 13, 1984, even though the contracting officer had received the letter on February 2. The contracting officer plaintiff asserts, thus, did not obtain a fully informed opinion from the technical personnel before deciding to award Diamond the contract, and therefore lacked a reasonable basis for making that decision.

In support of this contention, plaintiff argues that the standard for determining whether a claimant is entitled to recover bid preparation costs is "whether the Government's conduct was arbitrary and capricious toward the bidder-claimant." *Keco Industries, Inc. v. United States*, 203 Ct.Cl. 566, 574, 492 F.2d 1200, 1203 (1974) (*Keco II*). Arbitrary and capricious conduct can be established, plaintiff contends, where the decision to award lacks a reasonable basis. Plaintiff relies on *Keco II*, in which the Court of Claims, in *dicta*, identified four "subsidiary, but nevertheless general, criteria controlling" the determination of whether the government was arbitrary and capricious:

> One is that subjective bad faith on the part of the procuring officials, depriving a bidder of the fair and honest consideration of his proposal, normally warrants recovery of bid preparation costs. A second is that proof that there was *"no reasonable basis"* for the administrative decision will also suffice, at least in many situations. The third is that the degree of proof of error necessary for recovery is ordinarily related to the amount of discretion entrusted to the procurement officials by applicable statutes and regulations. The fourth is that proven violations of pertinent statutes or regulations can, but need not necessarily, be a ground for recovery.

*Id.*, 203 Ct.Cl. at 574, 492 F.2d at 1203–04 (citations omitted) (emphasis added).

However, as defendant points out, the *Keco II* court further explained that "[t]he application of these four general principles may well depend on (1) the type of error or

dereliction committed by the Government, and (2) whether the error or dereliction occurred with respect to the *claimant's own bid or that of a competitor.*" *Id.*, 203 Ct.Cl. at 574, 492 F.2d at 1204 (emphasis added). The *Keco II* court stated that the challenge of "government actions favoring *another bidder*—without any misreading or misevaluation of the claimant's own bid —prejudice[s] the complainant's chances for the award" and "[o]f course, where such favoritism or discrimination stems from subjective bad faith (*e.g.* predetermination of the award), the rejected bidder can recover...." *Id.*, 203 Ct.Cl. at 576, 492 F.2d at 1205 (emphasis added).

The court went on to emphasize that "in those cases where dishonesty and bad faith are absent, the rules governing the claimant's rights when the Government errs with respect to his *own* bid need not automatically be carried over, in every instance, to the comparable situation where the objective error solely concerns a competitor's proposal." *Id.*, 203 Ct.Cl. at 576–77, 492 F.2d at 1205 (emphasis in original). Consequently, the court reasoned that the "procuring agency's enforceable responsibility to a bidder to read or evaluate properly his competitor's bid may be appreciably less in certain situations." *Id.*, 203 Ct.Cl. at 577, 492 F.2d at 1205. In identifying the reasonable basis standard, the *Keco II* court cited cases that all involved the plaintiff's challenge of the government's treatment of the plaintiff's *own* bid. *See Id.*, 203 Ct.Cl. at 574–75, 492 F.2d at 1204 (citing *Continental Business Enterprises v. United States*, 196 Ct.Cl. 627, 637–38, 452 F.2d 1016, 1021 (1971); *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C.Cir. 1971); *Rudolph F. Matzer & Associates, Inc. v. Warner*, 348 F.Supp. 991, 994–95 (M.D.Fla.1972)).

The court's discussion indicates that bid preparation costs are recoverable in cases involving the erroneous treatment of a competitor's bid only where there is a showing of bad faith or fraud. The qualifying language in *Keco II* undermines plaintiff's argument that the reasonable basis standard should be applied here. Plaintiff can cite no specific authority in this

circuit, nor can this court find any, directly supporting its contention that recovery should be allowed upon a mere showing that the decision lacked a reasonable basis. Plaintiff relies on *dicta* in *Keco II*, which does not appear to apply to a challenge of the erroneous treatment of another bidder's proposal, and a patchwork of authority not controlling in this circuit.[2] This court, therefore, will refrain from extending existing law in the manner urged by plaintiff absent more convincing authority.

▪ In order for a disappointed contractor to recover based on the erroneous treatment of another bidder's proposal, there must be a showing that the actions of contracting officials demonstrate bad faith or fraud. *See, e.g., Burroughs v. United States*, 223 Ct.Cl. 53, 64, 617 F.2d 590, 597 (1980); *Keco II*, 203 Ct.Cl. at 577, 492 F.2d at 1206; *Vulcan Engineering Co.*, B–214595, 84–2 C.P.D. ¶ 403 at 6 (1984). In considering the actions of contracting officials, it is well established that regulations confer broad discretion upon a contracting officer in determining who is a responsible bidder. *Trilon Educational Corp. v. United States*, 217 Ct.Cl. 266, 270–71, 578 F.2d 1356, 1358 (1978); *Tidewater Management Services, Inc. v. United States*, 216 Ct.Cl. 69, 83–84, 573 F.2d 65, 73 (1978). Many of the criteria used by contracting officials "are not readily susceptible to reasoned judicial review." *Keco II*, 203 Ct.Cl. at 577, 492 F.2d at 1205. Accordingly, absent proof of bad faith or fraud, affirmative determinations of responsibility generally are not overturned. *Trilon*, 217 Ct.Cl. at 271, 578 F.2d at 1358; *Keco II*, 203 Ct.Cl. at 577, 492 F.2d at 1206.

In considering a claim of bad faith against the government, there is a strong presumption that government officials acted properly. *Burroughs*, 223 Ct.Cl. 53, 64–65, 617 F.2d at 597; *Contract Custom*

*Drapery Service, Inc. v. United States*, 6 Cl.Ct. 811, 817 (1984), *aff'd. mem.*, 785 F.2d 321 (Fed.Cir.1985). To overcome this presumption, a disappointed bidder must furnish "well-nigh irrefragable proof" of bad faith. *American General Leasing v. United States*, 218 Ct.Cl. 367, 374, 587 F.2d 54, 59 (1978) (quoting *Knotts v. United States*, 128 Ct.Cl. 489, 492, 121 F.Supp. 630, 631 (1954)). In the absence of bad faith, the contractor must establish fraud. *See Trilon*, 217 Ct.Cl. at 271, 578 F.2d at 1358.

Turning to the conduct of the government in this case, even if this court adopted the rule urged by the plaintiff, that a disappointed contractor may recover upon a showing that the decision to award the contract lacked a reasonable basis, plaintiff cannot recover. Although errors may have occurred in the procurement process, the record indicates that much of the conduct of the Navy in awarding the contract to Diamond represents reasonable and good faith efforts in applying the responsibility criteria. At the most, the conduct of the Navy amounts to simple negligence, which is insufficient to recover bid preparation costs. *Keco II*, 203 Ct.Cl. at 579, 492 F.2d at 1206–07; *Kinetic Structures Corp. v. United States*, 6 Cl.Ct. 387, 398 (1984). Certainly the actions taken do not rise to the level of bad faith or fraud, which would be necessary for plaintiff to recover.

Procurement officials made sufficiently reasonable efforts to apply the responsibility criteria in the IFB. This is not a case where the government failed altogether to even apply such criteria. For instance, when Diamond initially submitted Associated Mechanical Erectors Company as its equipment installation subcontractor on December 20, 1983, the Navy rejected the proposal because the requisite qualification criteria were not satisfied. With respect to the recommendation that Diamond be

---

2. Plaintiff extensively cites decisions of the Comptroller General, *see Haughton Elevator Division v. United States*, 55 Comp.Gen. 1051, 76–1 C.P.D. ¶ 294 at 8–9 (1976); *Lesko Associates, Inc.*, 83–1 C.P.D. ¶ 443 at 3 (1983), and J. Cibinic & R. Nash, *Formation of Government Contracts*, 223–24 (2d ed. 1986) to support its contention that recovery should be allowed where the con-

tract award lacked a reasonable basis. These authorities are not controlling in the Federal Circuit. *South Corp. v. United States*, 690 F.2d 1368, 1370 (Fed.Cir.1982); *Burroughs*, 223 Ct.Cl. at 63, 617 F.2d at 597; General Order No. 1 of the United States Claims Court (Oct. 7, 1982), *reprinted in* 1 Cl.Ct. XXI.

awarded the contract after Foundry was proposed as a subcontractor, the Navy had previously identified Foundry as a possible bidder in the pre-solicitation July 27, 1983 memo stating the need for experienced contractors and listing prospective bidders.

In sustaining the plaintiff's claim,[3] the Comptroller General was highly critical of the Navy's responsibility determination. The Comptroller General agreed with the plaintiff that "the January 31[, 1984] letter from Diamond, in which that firm described the experience of its proposed subcontractor, Foundry Systems, does not provide a basis upon which NAVFAC could reasonably determine that Diamond complied with the definitive responsibility criteria." *Vulcan*, 84–2 C.P.D. ¶ 403 at 10. In this regard, the Comptroller General noted that the January 31, 1984 letter lacked an adequate certification that the systems installed by Foundry had successfully performed for at least 24 months, and that Foundry had not actually done installation work for all of the six required foundry systems.[4]

The Comptroller General rendered his opinion based on a record that was different than the one currently before this court. The Comptroller General relied heavily on the information supplied by Diamond concerning Foundry's responsibility qualifications in its January 31, 1984 letter in deciding that the Navy lacked a reasonable basis for finding Diamond qualified. This decision was without the benefit of the deposition testimony of the Navy's technical personnel in the Design Division, "Code 403," concerning their work on the responsibility finding. In addition, responsibility determinations, unlike responsiveness questions, can be made where initial data submitted is inadequate but supplementary data satisfies the specified requirements. It is ordinarily the practice of the Navy to allow contractors to supplement responsibility data where they are initially found to be non-responsible, as Diamond was allowed to do in this case. Also, the procurement regulations require that responsibility determinations be made using the most current data available. *See* DAR § 1–905.2, 32 C.F.R. § 1–905.2 (1983). The Comptroller General did not have the op-

**3.** In sustaining plaintiff's claim, the Comptroller General relied on decisions that have no force of law in this circuit. The Comptroller General ruled that a disappointed contractor may recover upon a showing that the decision of procurement officials lacked a reasonable basis. 84–2 C.P.D. ¶ 403 at 7 (citing *Ampex Corp.*, B–212356, 83–2 C.P.D. ¶ 565 at 3 (1983)). However, this court is not bound by the decisions of the Comptroller General. *See supra* note 2.

**4.** The evidence relied on by the Comptroller General does not overwhelmingly support the conclusion that NAVFAC's decision to award the contract to Diamond was entirely without a reasonable basis. This court acknowledges that the Comptroller General "provides unique experience in the area of government procurement and a tradition of care and objectivity, including freedom from prior involvement in the matter at hand...." *M. Steinthal & Co.*, 455 F.2d at 1298. However, a review of the record and the Comptroller General's opinion indicates that the two points of principal concern to the Comptroller General—successful performance for at least 24 months and proof that Foundry had actually installed the systems in question—could have been resolved by "Code 403" reference checks conducted after the January 31, 1984 letter was submitted by Diamond. The information supplied by Vulcan does raise concern over Found-

ry's qualifications—namely the June 21, 1984 letter from the president of DICOA indicating that Foundry only bore overall responsibility for a segment of the DICOA project and the June 22, 1984 letter from the manufacturing director of Griffen stating that Foundry did not bear overall responsibility for installation and start-up. However, it should not be overlooked that this information was obtained by the plaintiff four months after the responsibility determination was made to support plaintiff's protest and its reliability must be judged accordingly. Moreover, the Comptroller General overlooked the fact that the information provided by the president of DICOA was not based on first hand knowledge because he was not employed with the company during the period when the installation work was done, but rather was obtained as hearsay from another individual in the company. Likewise, the characterizations of Foundry's role at the Griffen plant by its manufacturing director in his June 22, 1984 letter are vague and do not question Foundry's qualifications with any specific detail. The deficiencies in the data submitted by Diamond could possibly have been cured by subsequent reference checks. Moreover, because this court has ruled that recovery will only be allowed upon a showing of bad faith or fraud, the relative degree of reasonableness demonstrated by the government's conduct in this case is largely irrelevant.

portunity to consider evidence that "Code 403" personnel gathered additional information to supplement that submitted by Diamond, and the Comptroller General's conclusions must be accordingly qualified.

The "Code 403" personnel testified that they conducted a thorough investigation of Foundry's credentials and upon completion of their work were satisfied that Foundry was qualified. Joe Watson testified that he instructed Harold Jenkins to double check a number of areas regarding Foundry's qualifications. Jenkins did so and reported that the information he received in response to these inquiries satisfied Watson's concerns. Jenkins also testified that he would have liked to have disqualified Foundry if it were possible because he felt that better firms were available for the project but stated that he was unable to find that Foundry lacked the required credentials. Bearing in mind that a presumption of good faith and propriety operates in favor of the government in such circumstances, *Contract Custom Drapery*, 6 Cl.Ct. at 817, the Navy's decision does not appear to have been entirely unreasonable. Moreover, "[i]f the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion...." *M. Steinthal & Co.*, 455 F.2d at 1301.

Although apparently the recommendation to award the contract was made without the benefit of the information supplied in plaintiff's February 1, 1984 protest letter that Foundry had only acted as a broker at the DICOA and Griffen projects, it does not follow, as plaintiff asserts, that the decision to award the contract to Diamond lacked a reasonable basis, especially because the source of the information was a competitor for the contract. Finally, as the Comptroller General recognized, at least two different and reasonable interpretations of the responsibility requirements set forth in the IFB were possible at the time the decision to award was made. *Vulcan Engineering Co.*, B–214595, 84–2 C.P.D. ¶ 403 at 8 (1984). Since the responsibility criteria were ambiguous, it cannot be said that the Navy lacked a reasonable basis simply because it arrived at an interpretation that differs from the plaintiff's.

## CONCLUSION

Although, the plaintiff has standing to seek recovery of its bid preparation costs, it has failed to show that the decision of the Navy to award the contract to Diamond demonstrated bad faith or fraud or completely lacked a reasonable basis. Accordingly, recovery of bid preparation costs will be denied. Defendant's motion for summary judgment is granted, and plaintiff's cross-motion for partial summary judgment is denied. The clerk will dismiss the complaint. Each party will bear its own costs.